# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) |
| | )     Crim. Action No. 21-0246-1 & 2 (ABJ) |
| DANIEL RODRIGUEZ, | ) |
| EDWARD BADALIAN, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Defendants Daniel Joseph "DJ" Rodriguez, Edward Badalian, and a third unnamed defendant ("defendant three") have been charged in a ten-count indictment with the following offenses:

> Count One:  conspiracy to commit an offense against the United States in violation of 18 U.S.C. § 371 (all defendants)

> Count Two:   obstruction of an official proceeding and aiding and abetting in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (all defendants)

> Count Three:  tampering with documents or proceedings in violation of 18 U.S.C. § 1512(c)(1) (all defendants)

> Count Four:   obstruction of law enforcement during civil disorder in violation of 18 U.S.C. § 231(a)(3) (Rodriguez only)

> Count Five:  obstruction of law enforcement during civil disorder in violation of 18 U.S.C. § 231(a)(3) (defendant three only)

> Count Six:  inflicting bodily injury on certain officers in violation of 18 U.S.C. § lll(a)(l) and (b) (Rodriguez only)

> Count Seven: theft of government property in violation of 18 U.S.C. § 641 (Rodriguez and defendant three)

> Count Eight:   destruction of government property in violation of 18 U.S.C. § 1361 (Rodriguez only)

Count Nine:   destruction of government property in violation of 18 U.S.C. § 1361 (defendant three only)

Count Ten:  entering and remaining in restricted building or grounds in violation of 18 U.S.C. § 1752(a)(l), (b)(l)(A) (all defendants)

Superseding Indictment (REDACTED) [Dkt. # 65] ("Indictment").

Defendant Rodriguez has moved to dismiss Counts Two and Three, Def. Rodriguez's Mot. to Dismiss [Dkt. # 108] ("Rodriguez Mot.") at 8, and defendant Badalian has moved to dismiss Counts Two, Three, and Ten.  Def. Badalian's Mot. to Dismiss [Dkt. # 106] ("Badalian Mot.") at 4.  The government opposes both motions.  Gov't's Omnibus Opp. to Defs.' Mots. to Dismiss [Dkt. # 113] ("Gov't Opp.") at 1–2.  Both defendants filed replies, Rodriguez Reply to Gov't Opp. [Dkt. # 115] ("Rodriguez Reply"), Badalian Reply to Gov't Opp. [Dkt. # 117] ("Badalian Reply"), and the matter is fully briefed.  For the reasons set forth below, the motions will be **DENIED**.

## LEGAL STANDARD

The Federal Rules of Criminal Procedure require that an indictment must consist of "a plain, concise, and definite written statement of the essential facts constituting  the offense charged."  Fed. R. Crim. P. 7(c)(1).  The charging document "need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense."  *United States v. Williamson*, 903 F.3d 124, 130 (D.C. Cir. 2018), quoting *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014); *see United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).   "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be

punished.'"   *Hamling v. United States*, 418 U.S. 87, 117 (1974), quoting *United States v. Carll*, 105 U.S. 611, 612 (1882).

A criminal defendant may move to dismiss an indictment before trial based on a "defect in the indictment," Fed. R. Crim. P. 12(b)(3)(B), including constitutional challenges.   *See United States v. Eshetu*, 863 F.3d 946, 952 (D.C. Cir. 2017), *vacated in part on reh'g on other grounds*, 898 F.3d 36 (D.C. Cir. 2018).   "When considering a motion to dismiss an indictment, a court assumes the truth of those factual allegations." *United States v. Ballestas*, 795 F.3d 138, 149 (D.C. Cir. 2015), citing *Boyce Motor Lines v. United States*, 342 U.S. 337, 343 n.16 (1952).   A dismissal of an indictment "is granted only in unusual circumstances," because "a court's 'use[ ] [of] its supervisory power to dismiss an indictment . . . directly encroaches upon the fundamental role of the grand jury.'"   *Id.* at 148, quoting *Whitehouse v. U.S. Dist. Court*, 53 F.3d 1349, 1360 (1st Cir. 1995).

## ANALYSIS

I.   **Count Two alleging the obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) will not be dismissed.**

Count Two charges defendants with obstructing an official proceeding in violation of 18 USC §§ 1512 (c)(2):

> On or about January 6, 2021 within the District of Columbia, the defendants attempted to and did corruptly obstruct, influence and impede an official proceeding that is the certification of the Electoral College vote and did aid and abet each other and others known and unknown to do the same . . . .

Indictment at 14.  Defendants contend that the Electoral College vote certification does not qualify as an "official proceeding" within the meaning of the statute.  Rodriguez Mot. at 12–39; Badalian Mot. at 9–14.  They also maintain that Count Two should be dismissed because section 1512(c)(2) is unconstitutionally vague.  Rodriguez Mot. at 39–46; Badalian Mot. at 14–19.

These defendants are not the first to challenge whether indictments charging January 6 defendants under section 1512(c)(2) are deficient.  This Court has already addressed many of the legal issues raised here, *see generally United States v. Williams*, No. 21-cr-618, 2022 WL 2237301 (D.D.C. June 22, 2022), and, as noted in that opinion, similar challenges have been rejected by every court in this district to consider them – with one exception.  *See United States v. Sandlin*, 575 F. Supp. 3d 16, 21–34 (D.D.C. 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Caldwell*, Case No. 21-cr-28 (APM), 2021 WL 6062718, at *4–11 (D.D.C. Dec. 20, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Mostofsky*, Case No. 21-cr-138 (JEB), 2021 WL 6049891, at *8–13 (D.D.C. Dec. 21, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Montgomery*, Case No. 21-cr-46 (RDM), 2021 WL 6134591, at *4–10, *18–23 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Nordean*, Case No. 21-cr-175 (TJK), 2021 WL 6134595, at *4–12, *14–19 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 1512(c)(2)); Order, *United States v. Reffitt*, Case No. 21-cr-32 (D.D.C. Dec. 29, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. McHugh*, Case No. 21-cr-453 (JDB), 2022 WL 296304, at *3, *22 (D.D.C. Feb. 1, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Grider*, Case No. 21-cr-22 (CKK), 2022 WL 392307, at *3–8 (D.D.C. Feb. 9, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Bozell*, Case No. 21-cr-216 (JDB), 2022 WL 474144, at *1–7 (D.D.C. Feb. 16, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Robertson*, Case No. 21-cr-34 (CRC), 2022 WL 969546, at *3–6 (D.D.C. Feb. 25, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Andries*, Case No. 21-cr-93 (RC), 2022 WL 768684, at *3–17 (D.D.C. Mar. 14, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Puma*, Case No. 21-cr-454 (PLF), 2022 WL 823079, at *4–19 (D.D.C. Mar. 19, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. McHugh*, Case No. 21-cr-453 (JDB), 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022) ("*McHugh II*") (18 U.S.C. § 1512(c)(2)); *United States v. Bingert*,

Case No. 21-cr-91 (RCL), 2022 WL 1659163, at *3–11, *12–15 (D.D.C. May 25, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Fitzsimons*, Case No. 21-cr-158 (RC), 2022 WL 1698063, at *3–13 (D.D.C. May 26, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Rhodes*, Case No. 22-CR-15 (APM), 2022 WL 2315554, at *13–14 (D.D.C. June 28, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Robertson*, Case No. 21-CR-34 (CRC), 2022 WL 2438546, at *1–5 (D.D.C. July 5, 2022) (18 U.S.C. § 1512(c)(2)). In *United States v. Miller*, No. 21-cr-119, 2022 WL 823070 (D.D.C. Mar. 7, 2022), the court rejected defendant's arguments with respect to the "official proceeding" issue, but it did find section 1512(c)(2) to be an unconstitutionally vague residual clause. *See generally id.* No other court in the district has followed that ruling since.

Section 1512(c) states:

> (c) Whoever corruptly—
>
>> (1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
>>
>> (2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,
>
> shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1512.

The scope of the term "official proceeding" is not left to the reader's imagination, but it is specifically defined in the statute to include:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) a proceeding before the Congress;

5

(C)     a proceeding before a Federal Government agency which is authorized by law; or

(D)     a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency  to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce.

18 U.S.C. § 1515(a)(1).

**A.      The Electoral College certification is an "official proceeding" for purposes of 18 U.S.C. § 1512(c).**

**1.      The plain text of the statute supports a finding that the certification was an "official proceeding."**

Rodriguez and Badalian maintain that the joint session of Congress convened to certify the vote of the Electoral College in the 2020 presidential election pursuant to Article II, Section I of the United States Constitution does not constitute an "official proceeding" for purposes of the statute because "§ 1512 only criminalizes obstructive conduct related to a hearing before a tribunal affecting the administrative [sic] of justice."  Badalian Mot. at 11; Rodriguez Mot. at 4 ("Since the January 6, 2021, Election Certification served a ministerial function with no adjudicative or legal fact-finding involved, it does not meet the statute's definition of 'official proceeding.'").  But nothing in the text of the provision supports the imposition of this limiting construction.

First of all, Congress defined "official proceeding" in section 1515(a)(1) to be, among other things, "a proceeding before the Congress."  18 U.S.C. § 1515(a)(1).  The joint session to certify the vote of the Electoral College falls squarely within that definition, even if one adheres to the suggestion advanced by other courts in this district that the word "proceeding" in section 1515(a)(1) should be "defined narrowly" as the "business conducted by a court or other official

body; a hearing." *Sandlin*, 575 F. Supp. 3d at 22, citing *Proceeding*, Black's Law Dictionary (11th ed. 2019) (fourth definition); *see also McHugh*, 2022 WL 296304, at *5.

When one reads the words "proceeding before the Congress" in the context of the statutory definition of the term "official proceeding" – "a proceeding before a judge or court . . . or a Federal grand jury," "a proceeding before a Federal Government agency which is authorized by law," and "a proceeding . . . before any insurance regulatory official or agency" – the term appears to apply to a formal gathering before the body in question, *see United States v. Ermoian*, 752 F.3d 1165, 1172 (9th Cir. 2013), which is conducted under legal auspices, and is authorized to render some sort of decision or outcome.   One would be hard-pressed to identify many other proceedings on Capitol Hill with more formality than a joint session of both houses of Congress that is called for by the Constitution itself, and over which the Vice President of the United States is required to preside.   *See* U.S. Const. art. II, § 1; U.S. Const. amend. XII.   This was not merely a ceremonial gathering, as one might describe a State of the Union address, but it fits the definition of a proceeding "before the Congress" because a quorum consisting of "a Member or Members from two thirds of the States, and a Majority of all the States" was required to be there, U.S. Const. art. II, § 1, cl. 3, and there was something specific to be determined:   the outcome of the presidential election.[1]

---

[1]      Federal law specifies how members of Congress may challenge an electoral vote.  "Upon such reading of any such [electoral] certificate or paper, the President of the Senate shall call for objections, if any.   Every objection shall be made in writing, and shall state clearly and concisely, and without argument, the ground thereof, and shall be signed by at least one Senator and one Member of the House of Representatives."   3 U.S.C. § 15.   There are also procedures for each house to follow when debating and voting on an objection.   *See* 3 U.S.C. § 17.

Other courts in this district have also found meaning in the repetition of the word "before" in section 1515(a)(1).  The court in *McHugh* found that the certification proceeding meets the definition of an official proceeding as it involves one entity appearing "before" another. 2022 WL 296304, at *6 ("Fifty-three sections of the U.S. Code use the phrase 'a proceeding before,' and in every one the phrase describes a proceeding involving more than one entity, usually in a court-like setting where one entity 'appears before' another.").   Congress is the first entity, and the Electoral College can be identified as the second party appearing before it.  Although not physically present, the Electoral College must "vote by ballot for President and Vice-President" and "transmit [the results] sealed to the seat of the government of the United States, directed to the President of the Senate."   U.S. Const. amend. XII.   Congress must then formally convene to open, debate, and certify those results.  *Id.*; 3 U.S.C. § 15.  The votes themselves can  therefore be characterized as being "before" Congress.  *See Sandlin*, 575 F. Supp. 3d at 23; *McHugh*, 2022 WL 296304, at *7; *Montgomery*, 2021 WL 6134591, at *66–67.

Given the language of the statute, then, there is nothing to support defendants' suggestion that the formal gathering must be judicial in nature.  *See* Rodriguez Mot. at 16; Badalian Mot. at 11.  The limitation would be illogical, since Congress was created in Article I of the Constitution to be the legislative branch of the tripartite government, with powers distinct from those of the other branches.   While it may hold hearings to gather information relevant to potential enactments and amendments, and to perform its oversight responsibilities, it seldom sits as an adjudicative body or as the decision maker in an adversary proceeding.   *See Andries*, 2022 WL 768684, at *6 ("[T]he text and immediate context [of 18 U.S.C. § 1515(a)(1)] yield[] nothing to suggest that 'a proceeding before the Congress' must be adjudicative in nature.  Indeed, such a requirement would be inconsistent with the text 'proceeding before the Congress.' . . .

8

The reason is simple:  Congress hardly ever adjudicates.") (citation and quotation marks omitted).
And if Congress, which presumably was aware of what its function is supposed to be, intended
to restrict the obstruction statute to those infrequent trial-like proceedings within its purview, it
could have easily chosen to define "official proceeding" in section 1515(a)(1)(B) as "an
impeachment proceeding before the Congress."  *See Puma*, 2022 WL 823079, at *8 ("[I]f
Congress had intended to limit Section 1512(c)(2) to adjudicative or court-like proceedings, it
would have used different words to do so.").

This is why *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013), cited by defendants,
is not only not binding on this Court, but inapposite.  The decision examined whether an FBI
investigation qualified as an "official proceeding," and it found that the use of the preposition
"before" in the definition contained in section 1515(a)(1)(C) – a proceeding "before a Federal
agency" – "suggests an appearance in front of the agency sitting as a tribunal."  *Id.* at 1170–71.
According to defendants, the "logic and reasoning used by the Ermoian court . . . applies with
equal force to interpreting the term 'proceedings before the Congress,'" including the reasoning
that the words surrounding the term proceeding "contemplate a legal usage of the term."  Badalian
Mot. at 10–11; *see also* Rodriguez Mot. at 17 (relying on *Ermoian* for the argument that a
"proceeding" under the statute "indicates a sense of formality that is normally associated with legal
proceedings").  But *Ermoian* did not purport to address a congressional hearing, or even a typical
executive agency hearing; its reasoning derived from the fact that an FBI investigation "does not
occur 'before a Federal Government agency' like a hearing or trial might; it is conducted 'by' the
agency in the field."  752 F.3d at 1171.  It is true that the Ninth Circuit went on to say that the
provision "strongly implies that some formal hearing before a tribunal is contemplated," but again,
it was opining about "a proceeding before a Federal agency," section 1515(a)(1)(C), and not the

section applicable here, 1515(a)(1)(B), and it did not hold that the formal proceeding in question must be related to the administration of justice. *Id.* at 1172.[2]

Second, the provision of the criminal code at issue is extremely broad. In section 1512(c)(2), Congress provided that one who corruptly obstructs "*any* official proceeding" is subject to punishment, 18 U.S.C. § 1512(c)(2) (emphasis added), and the Supreme Court has explained that "[r]ead naturally, the word 'any' has an expansive meaning . . . ." *United States v. Gonzales*, 520 U.S. 1, 5 (1997); *see also Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008); *Montgomery*, 2021 WL 6134591, at \*4. Since Congress chose to use the word "any" in this provision, the Court should not presume to impose a limitation not found in the statute, as that would serve "to alter, rather than to interpret" the statutory language. *Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 140 S. Ct. 2367, 2381 (2020). This is particularly true when one takes note of the fact that Congress used "any" in section 1512(c), while selecting the articles "an" or "the" for other portions of section 1512. *See, e.g.*, 18 U.S.C. §§ 1512(a)(1)(A)–(B), (a)(2)(A)–(B), (b)(1)–(2), (c)(1), (d)(1), (f)(1), (g)(1), (i). For all of these reasons, the plain language of the statute supports the government's interpretation.

### 2.   Neither the legislative history nor the context of the provision within the statute or the criminal code as a whole compels a different finding.

When interpreting the text of a statute, a court should also consider "the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell*

---

2       *United States v. Perez*, 575 F.3d 164 (2d Cir. 2009), is similarly inapposite because it considers whether an investigation by the Bureau of Prisons was a proceeding "before a Federal Government agency" under section 1515(a)(1)(C), not section 1515(a)(1)(B) at issue here. And *United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994), analyzed a different statutory provision altogether, 18 U.S.C. § 1505. So defendants' reliance on them is misplaced. *See* Rodriguez Reply at 6–7; Badalian Reply at 5–6.

*Oil Co.*, 519 U.S. 337, 341 (1997).   Applying those principles, defendants argue that the Sarbanes-Oxley Act, which included section 1512(c)(2), was "aimed at preventing corporations from destroying records relevant to a federal hearing related to the administration of justice," and that the surrounding statutory provisions "are related to the obstruction of the administration of justice," and therefore, section 1512(c)(2) is limited to that context.  Badalian Mot. at 13–14; *see also id.* at 12 ("Nothing in the legislative history of the Sarbanes-Oxley Act supports the notion that Congress enacted [it] to criminalize the disruption of a ceremony before Congress by persons engaged in a political rally, no matter how large the crowd or how disorderly the activities of some in the crowd may have become."); Rodriguez Mot. at 4, 35 (arguing Sarbanes-Oxley's purpose was to provide "for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence in certain Federal investigations" and that section 1512(c) was added to the Act to close a loophole thereafter criminalizing the shredding of documents by individuals, not merely inducing others to do so).

The Court agrees with the observation of other courts in this district that the legislative history is of limited utility in this case. *See, e.g.*, *Montgomery*, 2021 WL 6134591, at *15; *Caldwell*, 2021 WL 6062718, at *16; *McHugh II*, 2022 WL 1302880, at *12.  However, the contemporaneous comments we do have indicate that, if anything, Congress intended to broaden the scope of section 1512(c) when it amended it as part of the Sarbanes-Oxley Act.  As the court detailed in *Caldwell*, 2021 WL 6062718, at *16, section 1512(c) was introduced "late in the legislative process."   During debate in the Senate, Senator Orrin Hatch explained that the amendment "strengthens an existing federal offense that is often used to prosecute document shredding *and other forms of obstruction of justice*" and "broaden[s] the scope of the Section 1512."   148 Cong. Rec. S6550  (daily ed. July 10, 2002) (emphasis added); *see also*

*McHugh II*, 2022 WL 1302880, at \*12 ("If Senator Hatch, for instance, thought that the new provision was only about document destruction, then his description of §1512(c) . . . would be quite strange.").[3]

Defendants direct the Court to *Yates v. United States*, 574 U.S. 528, 532 (2015).   *See* Badalian Mot. at 13 (asserting that in that case, "the Supreme Court clearly telegraphed that legal terms are to be narrowly construed given the legislative history and purpose of the Sarbanes-Oxley Act," and that the Act "was not intended to apply in all circumstances where *any* government function may have been impeded") (emphasis in original); Rodriguez Mot. at 35–36 (citing *Yates* for the principle that section 1512(c) was enacted close a loophole in Sarbanes-Oxley Act governing corporate fraud).   But in *Yates*, the Supreme Court was considering a different provision enacted as part of the Sarbanes-Oxley Act:   18 U.S.C. § 1519.   It penalizes "[w]hoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object," and the case concerned whether a commercial fishing captain could be said to have destroyed a "tangible object" when – contrary to a federal agent's instructions – he directed that the undersized fish in his catch be thrown overboard. *Yates*, 574 U.S. at 533–34.

The Supreme Court started with the observation that, as applied to those circumstances, the provision was ambiguous:

---

3        While courts should not look to debates in Congress as a guide to "ascertaining the meaning and purpose of the law-making body," *Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 474 (1921), courts are "justified in seeking enlightenment from . . . explanations given on the floor of the Senate and House by those in charge of the measure."   *Wright v. Vinton Branch of Mountain Tr. Bank of Roanoke, Va.*, 300 U.S. 440, 463 (1937).   Senator Hatch was in charge of this amendment.   *See* 148 Cong. Rec. S6549 (daily ed. July 10, 2002) ("the amendment that Senator Hatch and I offer today is carefully crafted to hold corporate officer[s] responsible").

> [W]hether a statutory term is unambiguous . . . does not turn solely on dictionary definitions of its component words.  Rather, the plainness or ambiguity of statutory language is determined not only by reference to the language itself, but as well by the specific context in which that language is used, and the broader context of the statute as a whole.

*Id.* at 537 (brackets and quotation marks omitted); *see also id.* ("In law as in life . . . the same words, placed in different contexts, sometimes mean different things.").  It therefore looked beyond the mere dictionary definitions to apply other traditional methods of statutory interpretation to construe the statute, and invoked *noscitur a sociis*, the principle that "a word is known by the company it keeps," and the need to "avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words, thus giving unintended breadth to the Acts of Congress."   *Id.* at 543 (citation omitted).   Since section 1519 also included such terms as "falsifies," and "makes a false entry in any record [or] document," the Court reasoned that it would not make sense in that context to include fish in the category of "tangible objects."   *Id.* at 543–44.

The *Yates* decision also looked to the canon of *ejusdem generis*, which counsels that if "general words follow specific words in a statutory enumeration, the general words are usually construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."   *Id.* at 545 (brackets and quotation marks omitted).   This did not bode well for the government's position on the fish either.[4]

---

4       The Supreme Court did not principally rely on the rule of lenity in *Yates*, but it noted that "if our recourse to traditional tools of statutory construction leaves any doubt about the meaning of 'tangible object,' as that term is used in § 1519, we would invoke the rule that 'ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity.'"   *Yates*, 574 U.S. at 547–48.  The Court finds it unnecessary to rely upon the rule in this instance, as the language in section 1512(c)(2) is unambiguous.

But nothing in those lessons in Latin alters the Court's analysis of section 1512(c)(2), or, of more importance here, its reading of the definition of "official proceeding" in section 1515(a)(1)(B).  The language is not at all ambiguous when applied to the joint session of Congress prescribed by the Constitution, and even if one looks at "proceeding before the Congress" within the context of the entire series of proceedings enumerated in section 1515(a)(1), there would be no inconsistency with, or undue breadth added to, the provision.   Furthermore, the term "official proceeding" appears by itself in section 1512(c)(2), and its definition in section 1515(a)(1) does not include a series of specific terms followed by a general one either; a proceeding "before the Congress" is a specific proceeding contained in a list of other specific proceedings, so the canon of *ejusdem generis* has no bearing on the matter.

Defendants also address the structure of the statute and argue that because "[s]everal of the subsections of Chapter 73 explicitly relate to the administration of justice," section 1512's placement within Chapter 73 of Title 18 shows that it should only apply to the obstruction of the administration of justice.   Badalian Mot. at 13–14; Rodriguez Mot. at 18–19.   This theory is undermined by the very case cited in defendants' motions.

The Supreme Court noted in *Yates* that when Congress codified the various provisions contained in the Sarbanes-Oxley Act, it directed that section 1519 – the destruction of records and tangible property provision at issue in *Yates* – should follow sections that "prohibit[] obstructive acts in specific contexts."  *Yates*, 574 U.S. at 540.   And while Congress placed section 1519 "adjacent to these specialized provisions," according to the Court, it placed other additions to Chapter 73, including section 1512(c), "within or alongside retained provisions that address obstructive acts *relating broadly to official proceedings and criminal trials*."   *Yates*, 574 U.S. at 540 (emphasis added); *see id.* at 541 ("Section 1102, 'Tampering with a record or

otherwise impeding an official proceeding,' was codified as § 1512(c) and inserted within the pre-existing § 1512, which addresses tampering with a victim, witness, or informant to impede *any* official proceeding.") (emphasis added).   By differentiating section 1512 from the other "specialized provisions" in Chapter 73, the Supreme Court emphasized its breadth, and therefore *Yates* supports, and does not foreclose, this Court's interpretation.

Badalian argues that "the government incorrectly conflated an 'official proceeding' under § 1512 with a 'federally protected function' under 18 U.S.C. § 231(a)(3) or the 'official business' of Congress under 40 U.S.C. § 5104(e)(2)(c)." Badalian Mot. at 14.   The Electoral College certification, he maintains, "may be more appropriately considered the 'official business' of Congress or a 'federally protected function' rather than an 'official proceeding before the Congress' as captured by 18 U.S.C. §§ 1512(c) and 1515," and therefore "[c]harging Mr. Badalian with obstruction under 18 U.S.C. § 1512(c)(2) is, quite simply, overkill." *Id.*

It is entirely unremarkable that more than one provision in the criminal code could apply to a person's conduct, and, as the lack of any case authority in the motion on this point would suggest, that would not be a basis for the dismissal of the charge the government selected.

Moreover, a "federally protected function" is defined as:

> any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails.

18 U.S.C. § 232.   This definition appears to focus on the activities of federal agencies and law enforcement officials as opposed to Congress.   *See Caldwell*, 2021 WL 6062718, at *6.

The term "official business" as used in 40 U.S.C. § 5104(e)(2)(C) would apply to congressional actions; the provision prohibits "[a]n individual or group of individuals" from

"willfully and knowingly . . . with the intent to disrupt the orderly conduct of official business, enter[ing] or remain[ing] in a room in any of the Capitol Buildings."  But defendant does not present any reasons why "official business" and "official proceeding" cannot both encompass the Electoral College certification.  *See* Badalian Mot. at 14.   Moreover, the prohibitions in 40 U.S.C. § 5104(e)(2)(C) and 18 U.S.C. § 1512(c)(2) reach different conduct directed at a congressional proceeding:  one prohibits "enter[ing] or remain[ing] in a room in any of the Capitol Buildings" "with the intent to disrupt the orderly conduct of official business," and the other prohibits "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding."  Since both statutes explicitly relate to Congress, "[s]ome overlap . . . is, of course, inevitable," *Marinello v. United States*, 138 S. Ct. 1101, 1107 (2018); *see also Caldwell*, 2021 WL 6062718, at *6, but that does not make either provision invalid.

In sum, defendants' attempt to narrow the reach of section 1512(c)(2) to obstructing the administration of justice in an adjudicative context is not supported by its legislative history or the structure of the statute as a whole, and it would be entirely inconsistent with the text of the prohibition against obstructing or impeding "any" official proceeding, which was expressly defined to include a "proceeding before the Congress."

### B.      Section 1512(c)(2) is not limited by subsection (c)(1), and the indictment need not allege the alteration of records.

Rodriguez points to the decision in *Miller* and argues that section 1512(c)(2) cannot be read to cover interfering with the certification of the Electoral College vote.  He submits that subsection 1512(c)(2) can be read three different ways:  as separate and "untethered" from 1512(c)(1), Rodriguez Mot. at 23–30; as narrowed by the specific examples of conduct set forth in subsection (c)(1), *id.* at 30–33; or as a residual clause for subsection (c)(1), *id.* at 33–37, and he

urges the Court to follow *Miller* and treat subsection (2) as merely a residual clause related to what came before. *Id.* at 33–37.

In *United States v. Miller*, the court found that "there are two plausible interpretations of [18 U.S.C. § 1512(c)(2)]: either § 1512(c)(1) merely includes examples of conduct that violates § 1512(c)(2), or § 1512(c)(1) limits the scope of § 1512(c)(2)." 2022 WL 823070, at *15. The more plausible interpretation, according to the *Miller* court, was the latter, and therefore it found that the indictment failed to allege a violation of 18 U.S.C. § 1512(c)(2). *Id.*; *see also Fischer*, 2022 WL 782413, at *4 ("The Court recently concluded [in *Miller*] that the word 'otherwise' links subsection (c)(1) with subsection (c)(2) in that subsection (c)(2) is best read as a catchall for the prohibitions delineated in subsection (c)(1).").

The *Miller* court relied heavily on *Begay v. United States*, 553 U.S. 137 (2008), *abrogated on other grounds by Johnson*, 576 U.S. 591 (2015), and *Yates v. United States*, 574 U.S. at 528. In *Begay*, the Supreme Court considered whether drunk driving was a "violent felony" for the purposes of the sentencing provision imposing a mandatory minimum term on an offender with three prior convictions "for a violent felony," as that term was defined in 18 U.S.C. § 924(e)(2)(B)(ii) ("the term 'violent felony' means any crime punishable by imprisonment for a term exceeding one year . . . that-- . . . is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another"). 553 U.S. at 141. The Court concluded that the examples listed before "otherwise" limited the scope of the residual clause to similar crimes, and that drunk driving fell "outside the scope" of the ACCA. *Id.* at 142–48.

The *Miller* court reasoned that, because "the *Begay* majority opinion rejected the government's argument 'that the word 'otherwise' is sufficient to demonstrate that the

examples [preceding 'otherwise'] do not limit the scope of the clause [following 'otherwise'],'" *Miller*, 2022 WL 823070, at *9 (alterations in original, emphasis in original removed), section 1512(c)(1) most likely also limits the scope of section 1512(c)(2). *Id.* at *9–11.

This Court respectfully disagrees with *Miller*'s reasoning, and along with other courts in the district, declines to follow it. The Court is not basing its determination on a finding that the mere appearance of the word "otherwise" is sufficient to answer the question and establish that the first clause, section 1512(c)(1), was not meant to serve as a limit on the second clause, subsection (c)(2). Rather, the Court has considered the language and structure of the statute, and it agrees with the reasoning in other decisions in this district rejecting the *Miller* court's application of *Begay*. *See McHugh II*, 2022 WL 1302880, at *5–12; *Bingert*, 2022 WL 1659163, at *7–11.

For one thing, the structure of section 1512(c)(2) does not parallel the structure of the ACCA, and "otherwise" in section 1512(c)(2) does not immediately follow a list of examples. And sections 1512(c)(1) and (c)(2) – which prohibit different types of conduct – do not overlap in the same way that the ACCA clauses overlapped, and this makes a conclusion that what follows the term "otherwise" is an extension of the prior provision less likely. *Compare* 18 U.S.C. § 1512(c), *with* 18 U.S.C. § 924(e)(2)(B). Indeed, the Supreme Court noted in *Begay* that "the word 'otherwise' *can* (we do not say *must*) refer to a crime that is similar to the listed examples in some respects but different in others." 553 U.S. at 144 (emphasis in original, citation omitted).

18

As the court observed in *McHugh II*, the way Congress drafted the two provisions indicates that they were intended to target different conduct:

> Rather than a continuous list with a general term at the end, § 1512(c) contains two separately numbered paragraphs, with a semicolon and a line break separating the "otherwise" clause in paragraph (c)(2) from the preceding terms in paragraph (c)(1). Furthermore, paragraph (c)(2) is grammatically distinct from paragraph (c)(1). Although the two provisions share a subject and adverb ("whoever corruptly"), paragraph (c)(2) contains an independent list of verbs that take a different object ("any official proceeding") from the verbs in paragraph (c)(1) (which take the object "a document, record, or other object"). In short, rather than "A, B, C, or otherwise D," section 1512(c) follows the form "(1) A, B, C, or D; or (2) otherwise E, F, or G."

2022 WL 1302880, at *5 (citation omitted).

As for *Miller*'s finding that "[r]eading § 1512(c)(2) alone is linguistically awkward," 2022 WL 823070, at *6, this would not be the case if one reads "otherwise" to "'signal[] a shift in emphasis' from actions directed at evidence to actions directed at the official proceeding itself." *Montgomery*, 2021 WL 6134591, at *12, quoting *Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 520 (2015). The provision also makes sense if "otherwise" is understood to mean "in a different way." *McHugh II*, 2022 WL 1302880, at *4. Under either interpretation, the meaning of the statute is clear:   a person can violate section 1512(c)(2) through means that differ from document destruction, and the term "otherwise" does not limit the prohibition in section 1512(c)(2) to conduct described in section 1512(c)(1).

Since the scope of section 1512(c)(2) is not limited by (c)(1), the indictment need not allege the destruction or falsification of records, and Count Two states a valid claim under the statute.

### C.    18 U.S.C. § 1512(c)(2) is not unconstitutionally vague.

Defendants also move to dismiss Count Two on the grounds that the terms "official proceeding," "corruptly," and "otherwise" in section 1512(c)(2) are vague, and therefore, the

statute does not provide fair notice as to the conduct it punishes.  Badalian Mot. at 14–19 (arguing all three terms are unconstitutionally vague); Rodriguez Mot. at 39–46 (arguing "corruptly" is unconstitutionally vague).

### 1.   "Official Proceeding"

A penal statute is not void for vagueness if it "define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).   As noted above, the term "official proceeding" is defined by section 1515 to include a "proceeding before the Congress," as well as several other types of proceedings that can be readily understood.  18 U.S.C. § 1515(a)(1).  Indeed, as another court in this district pointed out, "it is difficult to fathom that a reasonable person would not believe the Electoral College certification was an official proceeding . . . this is precisely the reason why the January 6 rioters wished to stop it."  *Mostofsky*, 2021 WL 6049891, at *11.   Since ordinary people using common sense could understand the nature of the conduct prohibited by 18 U.S.C. § 1512(c), the term is not impermissibly vague.  *See Williams*, 553 U.S. at 304.  Further, defendant Badalian has not pointed to any word in the statute that requires the sort of subjective analysis that would create a risk of arbitrary enforcement that he asserts has occurred; his argument that the statute is void on its face for that reason is based instead on what is essentially an as-applied analysis – which the Court addresses in section I.C.4 below.  *See* Badalian Mot. at 17–19 (summarizing six January 6 cases and asserting that the government's charging decisions are inconsistent).

2.      "Corruptly"

Both defendants argue that the statute's *mens rea* component – "corruptly" – is impermissibly vague.  Rodriguez Reply at 2; Badalian Reply at 2.  Badalian asserts the term is vague on its face, Badalian Mot. at 16–17, and both defendants contend it is vague as applied. Rodriguez Mot. at 39–46; *see* Badalian Mot. at 17–19.  They rely heavily on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991).  *See* Badalian Mot. at 16–17; Rodriguez Mot. at 43– 46.

The ruling in *Poindexter* was addressed to the meaning of the word as applied in its unique factual scenario, and it is not controlling here.  In *Poindexter*, the former National Security Advisor John Poindexter was convicted on five felony counts arising out of his role in the Iran/Contra Affair, including a conviction for violating 18 U.S.C. § 1505.  The Iran/Contra Affair involved national security officials in the Reagan Administration who were secretly involved in facilitating the sale of arms to the Islamic Republic of Iran – which was subject to an embargo – and supporting the Contras in their attempt to overthrow the Sandinista government in Nicaragua – which was specifically prohibited by statute.  *Poindexter*, 951 F.2d at 371–72.  Poindexter was compelled to provide congressional testimony concerning his role in those events.  *Id.* at 372.  He was subsequently charged with corruptly obstructing Congress's inquiry by making false statements, participating in the preparation of a false chronology, and deleting information about the arms shipment from his computer.  *Id.*

Section 1505 provides:

> Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede . . . the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress . . . Shall be fined [or] imprisoned not more than 5 years . . . or both.

18 U.S.C. § 1505.  Poindexter challenged his section 1505 convictions on the grounds that "use of the term 'corruptly' renders the statute unconstitutionally vague as applied to this conduct." *Poindexter*, 951 F.2d at 377.  Although the Court acknowledged that, "on its face, the word 'corruptly' is vague," *id.* at 378, and held the term too vague "[a]s used in § 1505 . . . to provide constitutionally adequate notice that it prohibits lying to the Congress," *id.* at 379, it did "not conclude that the ambiguity of the term 'corruptly' in § 1505 renders that term unconstitutionally vague as applied to all conduct."  *Id.* at 385–86 (holding the term "may constitutionally be applied" to "core behavior"), citing *United States v. Harriss,* 347 U.S. 612, 618 (1954) ("if the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though marginal cases could be put where doubts might arise").

As the district court in *Sandlin* observed, "[c]ourts have since cabined *Poindexter*'s holding to its facts and have not read it 'as a broad indictment of the use of the word 'corruptly' in the various obstruction-of-justice statutes.'"  *Sandlin*, 575 F. Supp. 3d at 31, quoting *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998); *see also McHugh*, 2022 WL 296304, at *10; *Montgomery*, 2021 WL 6134591, at *18–19; *Caldwell*, 2021 WL 6062718, at *8–11; *Bozell*, 2022 WL 474144, at *6; *Nordean*, 2021 WL 6134595, at *10; *Mostofsky*, 2021 WL 6049891, at *11; *see also United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017) (finding that

discussion of the term "corruptly" in *Poindexter* "does not undermine [defendant's] convictions" under 18 U.S.C. § 1512(b)(3)).

The Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) has more bearing on the instant motion. In that case, the Supreme Court examined the meaning of 18 U.S.C. § 1512(b)(2)(A) and (B), which make it a crime to "'knowingly . . . corruptly persuad[e] another person . . . with intent to . . . cause' that person to 'withhold' documents from, or 'alter' documents for use in, an 'official proceeding.'" 544 U.S. at 698 (alterations in original). It found that the "natural meaning" of "corruptly" was "clear": the term is "normally associated with wrongful, immoral, depraved, or evil" conduct. *Id.* at 705; *see also id.* at 703–04 (distinguishing such conduct from that which is not "inherently malign"). While the *Arthur Andersen* case did not consider the meaning of the term within the specific context of section 1512(c)(2), several circuits have since relied on the decision to conclude that "corruptly," as used in section 1512(c), requires a showing of "dishonesty," an "improper purpose," or that defendant acted "wrongfully." *See United States v. Farrell*, 921 F.3d 116, 141 (4th Cir. 2019) (as applies to section 1512(c)(2), "[t]o act 'corruptly' means to act wrongfully"); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding jury instructions defining "corruptly" to "mean[] that the defendant acted with the purpose of wrongfully impeding the due administration of justice"); *see also United States v. Delgado*, 984 F.3d 435, 452 (5th Cir. 2021) ("[A] person acts 'corruptly' under [18 U.S.C. § 1512(c)(2)] when they act 'knowingly and dishonestly, with specific intent to subvert or undermine the due administration of justice.'"); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) ("Acting 'corruptly' within the meaning of § 1512(c)(2) means acting 'with an improper purpose and to engage in conduct

knowingly and dishonestly with the specific intent to subvert, impede or obstruct the [proceeding].”), quoting *United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011).

The D.C. Circuit has not yet addressed the constitutionality of the word “corruptly” in the context of section 1512(c).  Given *Arthur Andersen* and the instructive decisions set forth above, the Court agrees with the determinations of the other courts in the district that the inclusion of the term does not render the statute unconstitutionally vague on its face.  *See, e.g.*, *Sandlin*, 575 F. Supp. 3d at 30 (Defendant’s “facial challenge to § 1512(c)(2) . . . fails because the statute specifies ‘core’ behavior to which it constitutionally applies, though there may be scenarios at the edges that present vagueness problems.”).

Furthermore, the term is not vague as applied here.  Rodriguez argues that the statute is vague as applied to him because, as he sees it, he was charged for his “sincerely held political belief that the 2020 presidential election was not fairly decided,” which leaves “judges and prosecutors to decide which sincerely held political beliefs are to be criminalized on an ad hoc basis.”  Rodriguez Mot. at 45–46.  But it was defendants’ criminal conduct, *Arthur Andersen*, 544 U.S. at 704, not their political beliefs, that formed the basis for the indictment.  Defendants are charged with obstructing and impeding the certification proceeding, and the indictment alleges that they engaged in advance planning, forcibly breached the Capitol building, assaulted a law enforcement officer, and destroyed property.  Indictment at 3, 10–12.  With respect to Rodriguez specifically, it is alleged that he “push[ed] against police officers who were trying to prevent the rioters from entering the Capitol building,” “threw a flagpole at the police line in the doorway and deployed a fire extinguisher at [law enforcement] officers,” “twice applied the small, black electroshock weapon to the back of Officer M.F.’s neck;” “slamm[ed] a flagpole repeatedly into the window” of an office inside the Capital to gain entry; forced entry into another office and

"opened bags in the office, rifled through papers on the desks, and removed emergency escape hoods from the bags, two of which he took from the building when he left"). *Id.* at 10–12. The joint session of Congress was halted for hours as Members of Congress were evacuated, and law enforcement sought to regain control of the Capitol and restore order. *Id.* at 4. Considering "the context in which the term 'corruptly' appears and avoid[ing] the vagueness inherent in words like 'immorally,'" *Poindexter,* 951 F.2d at 379, the Court finds that that indictment alleges sufficient inherently wrongful conduct carried out with the intent to obstruct an official proceeding to support a finding that the statute gave defendants fair notice that the alleged conduct was unlawful.

Of course, the government still has to prove the requisite level of intent. The Court will provide jurors with instructions as to the meaning of the term "corruptly" at the appropriate time. Depending on the facts introduced at trial, one or both of the defendants may have a valid argument at the close of the government's case that the evidence was insufficient to establish the necessary element of a corrupt purpose. At this juncture, though, predictions about the state of the record at that time are not a basis to dismiss the indictment on its face. *See McHugh*, 2022 WL 296304, at *3 ("In deciding a motion to dismiss an indictment, the question before the Court is a narrow one, and the court will neither review the sufficiency of the evidence against the defendant nor craft jury instructions on the elements of the crimes charged.") (brackets and citations omitted).

Thus, the indictment will not be dismissed on the basis that the term "corruptly" is unconstitutionally vague.

###### 3.    "Otherwise"

Section 1512(c) reaches anyone who corruptly –

> (1) alters, destroys, mutilates, or conceals a record, document, or other object . . . with the intent to impair the object's integrity or availability for use in an official proceeding; or

> (2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so . . . .

18 U.S.C. § 1512(c)  (emphasis added).

Defendants argue that the use of the broad term "otherwise" renders subsection (c)(2) ambiguous and unconstitutionally vague.  Badalian Mot. at 15; Rodriguez Mot. at 41–42.  They cite *Johnson v. United States*, 576 U.S. 591 (2015), which considered whether the "residual clause" in the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), was too vague  to comport with the Fifth Amendment.  That statute imposes enhanced penalties on a defendant convicted of being a felon in possession of a firearm if he had three or more prior convictions for a "violent felony," defined as "any crime punishable by imprisonment for a term exceeding one year . . . that . . . is burglary, arson, or extortion, involves use of explosives, *or otherwise involves conduct that presents a serious potential risk of physical injury to another*." 18 U.S.C. § 924(e)(B)(ii) (emphasis added).  In *Johnson*, the Supreme Court concluded that "the indeterminacy of the wide-ranging inquiry required by the residual clause both denies fair notice to defendants and invites arbitrary enforcement by judges," and therefore it found that increasing  a  defendant's sentence under the provision denied due process of law.  *Johnson*, 576 U.S. at 597.  In particular, the Court expressed concern that the residual clause "leaves grave  uncertainty  about  how  to estimate the risk imposed by a crime," *id.*, and that "it leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony."  *Id.* at 598. The majority opinion also observed that in the nine years after the statute was enacted, there were

numerous splits among the lower federal courts, reflecting "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider." *Id.* at 601.[5]

It is important to note, though, that the Supreme Court did not hang its hat on the appearance of the word "otherwise" – its objection was to the lack of precision in the language that followed. Here, subsection (c)(1) clearly enumerates certain acts that would violate section 1512 of Title 18 if done corruptly, and there is nothing indeterminate about the other means of violating the statute set forth as an alternative in subsection (c)(2). "Obstruct," "influence," and "impede" are plain terms that are easily understood. They are found in other statutory provisions, *see, e.g.*, 18 U.S.C. §§ 231, 1503, 1505, and they have been included in long-approved jury instructions. *See* Instruction No. 6.101, Obstructing Justice, Criminal Jury Instructions for the District of Columbia (16th ed.); *see also* 2A Fed. Jury Prac. & Instr. § 48:01 (6th ed.). Further, there is a requirement that one must obstruct or impede *an official proceeding*. Since section 1512(c)(2) does not require a court or jury to make the sort of standard-free inquiry that troubled the majority in *Johnson* in order to determine the scope of the conduct prohibited, the use of the term "otherwise" does not render section 1512(c)(2) unconstitutionally vague.

Moreover, the decision in *Johnson* arose out of the unique context of the ACCA, and the pre-existing precedent for how its sentencing enhancements should be applied. In accordance with

---

5       In an attempt to strengthen the parallel, defendants refer to section 1512(c)(2) as the "residual clause" of the obstruction statute, *see e.g.*, Badalian Mot. at 15, Rodriguez Mot. at 41, but the Court will not implicitly endorse defendants' interpretation by adopting their terminology. As set forth above, the Court is not at all sure that subsection (2) can appropriately be described as a "residual clause," since it does not purport to add a catch-all category to the list of specific types of conduct set out in subsection (1), but it seems to set out a separate list of its own.

the case law that preceded *Johnson*, trial courts are required to use a "categorical approach" when determining whether the offense underlying a prior conviction qualifies as a violent felony under the ACCA; that is, courts must assess a crime "in terms of how the law defines the offense and not in terms of how an individual offender might have committed it on a particular occasion." *Johnson*, 576 U.S. at 596, quoting *Begay v. United States*, 553 U.S. 137, 141 (2008). Given this required approach, the Supreme Court explained that the ACCA's residual clause created "grave uncertainty about how to estimate the risk posed by a crime" because it tied "the judicial assessment of risk to a judicially imagined 'ordinary case' of a crime, not to real-world facts or statutory elements." *Id.* at 597. In addition, the clause left unclear how much risk was required for a crime to qualify as a violent felony. *Id.* at 598.

The connection between the holding in *Johnson* and the specific context of the requirement to use the categorical approach becomes even more clear when one reviews the Supreme Court decisions that followed. In *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018), the Court ruled that a similarly-worded residual clause in 18 U.S.C. § 16 was unconstitutional. That statute defined a "crime of violence" to include a felony that "by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." *Dimaya*, 138 S. Ct. at 1211, quoting 18 U.S.C. § 16. Relying on its analysis in *Johnson*, the Court held that this provision, which was also found to require courts to use the "categorial approach" to determine if an offense qualified as a crime of violence, had "the same two features as ACCA's, combined in the same constitutionally problematic way." *Id.* at 1211–13. It "call[ed] for a court to identify a crime's 'ordinary case' in order to measure the crime's risk" and presented the same "uncertainty about the level of risk that makes a crime 'violent.'" *Id.* at 1215; *see also id.* at 1216 (explaining that like the ACCA clause, the

section 16 clause required courts to "picture the kind of conduct that the crime involves in the ordinary case, and to judge whether that abstraction presents some not-well-specified-yet-sufficiently-large degree of risk") (quotation marks omitted).

Thereafter, in *United States v. Davis*, 139 S. Ct. 2319 (2019), the Supreme Court ruled that the residual clause in 18 U.S.C. § 924(c) was also unconstitutionally vague. Section 924(c)(1) provides increased penalties for "any person who, during and in relation to any crime of violence . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm," and section 924(c)(3) defined a "crime of violence" to be a felony that

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or

> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

18 U.S.C. § 924(c)(3).   In finding the second clause of the definition vague, the Court relied on its analyses in *Johnson* and *Dimaya* and observed that the clauses held unconstitutional in those cases "bear more than a passing resemblance" to section 924(c)(3)(B).   *Davis*, 139 S. Ct. at 2325–27. Indeed, in that case, the government conceded that applying "exactly the same categorical approach that [the Supreme] Court found problematic in the residual clauses of the ACCA and § 16" to section 924(c)(3)(B) would make it unconstitutional.   *Id.* at 2326–27.

Since it is clear that the holding in *Johnson* was rooted in its context – the particular difficulties involved in applying the categorical approach to determine if offenses fell within a broad catch-all phrase included in a statutory definition – it can be distinguished from the case at hand.  Courts applying section 1512(c)(2) will have no cause to wrestle with the categorical

approach, and the problems that led the Supreme Court to throw in the towel on the residual clause in the ACCA after years of uncertainty and discord are absent in this case.

Finally, as noted above, while the residual clause involved in *Johnson* was meant to describe a set of offenses that would also be included in the category being defined in the sentence as a whole – violent felonies – the second clause of section 1512(c) does not purport to identify a category of additional crimes that fall within those enumerated in the first clause. Rather, section 1512(c)(2) criminalizes a different type of conduct altogether:  section 1512(c)(1) prohibits altering, destroying, mutilating, or concealing evidence that would be *used* in an official proceeding, but section 1512(c)(2) directly prohibits the obstruction of an official proceeding itself.  Even if one could imagine a scenario in which section 1512(c)(1) and (2) might overlap, this does not render the second clause vague or invalid.  "Congress may, and often does, enact separate criminal statutes that may, in practice, cover some of the same conduct." *Hubbard v. United States*, 514 U.S. 695, 714 n.14 (1995).   For all of these reasons, the Court will not dismiss the section 1512(c)(2)  charge in Count Two on  the  grounds  that  the clause that begins with "otherwise" of  the  statute  is unconstitutionally vague.

### 4.    Inconsistencies in Charging

Finally, Badalian argues that "the government's approach to charging defendants with a violation of § 1512(c)(2) arising out of events of January 6, 2021, illustrates how vague and arbitrary the enforcement of this statute can be."  Badalian Mot. at 17.   He posits that "the facts and circumstances of each [January 6th case] vary drastically from each other and make it clear that the government's charging decisions are inconsistent."   *Id.* at 18.

But here Badalian demonstrates that he does not understand the arbitrary enforcement prong of the void for vagueness doctrine.  One does not go about mounting a facial challenge to

a criminal provision by contrasting how the statute has been applied in individual cases; the case law requires the defendant to identify language in the text that requires the arresting officer to make a "wholly subjective judgment without statutory definitions, narrowing context, or settled legal meanings." *Williams*, 553 U.S. at 306.  As the D.C. Circuit explained in *Agnew v. District of Columbia*:

> A law invites arbitrary and discriminatory enforcement when "there are no standards governing the exercise of the discretion" it grants. . . . This category includes laws whose application turns on subjective judgments or preferences either of officers or of third parties.

920 F.3d 49, 55 (D.C. Cir. 2019) (citation omitted).  Defendant points to no provision in section 1512(c)(2) that is infirm for those reasons.  *See* Badalian Mot. at 17–19.

Moreover, it is not the province of the Court to oversee the executive's exercise of prosecutorial discretion; as the Supreme Court has pointed out, enforcing criminal laws necessarily "requires the exercise of some degree of police judgment," *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972), and this circumstance alone does not mean that a statute is unconstitutionally vague.  *Agnew*, 920 F.3d at 55.  Also, "[i]t is not unusual for a particular act to violate more than one criminal statute, . . . and in such situations the Government may proceed under any statute that applies."  *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring in part and dissenting in part) (citations omitted); *see also Grider*, 2022 WL 392307, at \*7; *McHugh*, 2022 WL 296304, at \*12; *Nordean*, 2021 WL 6134595, at \*12; *Montgomery*, 2021 WL 6134591, at \*23; *Sandlin*, 2021 WL 5865006, at \*9; *Griffin*, 549 F. Supp. 3d at 58.[6]

---

6    Defendant Rodriguez makes a passing reference to his First Amendment right to petition the government for a redress of grievances, but makes no argument under the First Amendment requiring the Court's consideration.  *See* Rodriguez Mot. at 42.

Finally, there is nothing surprising or untoward about the fact that different individuals may have engaged in different acts to obstruct or impede the proceeding that was underway; there are often multiple ways to commit the same offense.

For all of these reasons, the Court will **DENY** defendants' motions to dismiss Count Two.

## II. Count Three, alleging tampering with records and proceedings in violation of 18 U.S.C. § 1512(c)(1), will not be dismissed.

Count Three charges that defendants tampered with evidence and proceedings in violation of 18 U.S.C. § 1512 (c)(1):

> Between on or about January 6, 2021, and on or about January 19, 2021, the defendants, within the District of Columbia and elsewhere, . . . did corruptly alter, destroy, mutilate and conceal a record, document, and other object and attempted to do so, with the intent to impair its integrity and availability for use in an official proceeding, that is, the grand jury investigation into the attack on the Capitol on January 6, 2021.

Indictment at 15.  The evidence at issue are photographs and videos taken by an unidentified individual "Person One" at the Capitol on January 6, 2021, which are alleged to show defendants participating in the riot.  *Id.* at 13–14.

Defendants challenge Count Three on the grounds that the indictment does not allege interference with an "official proceeding" as is required in 18 U.S.C. § 1512 (c)(1), and that the term "corruptly" is unconstitutionally vague.  Badalian Mot. at 7–19; Rodriguez Mot. at 39–46. But as the Court has found in connection with Count Two, the use of the term "corruptly" does not render section 1512 to be unconstitutionally vague, and Count Three will not be dismissed on those grounds for the reasons set forth above.  And defendants' argument that the certification of the electoral vote is not an "official proceeding" for purposes of subsection (c)(1) is not only incorrect for the reasons detailed in connection with Count Two, but it is entirely misplaced, as Count Three

does not related to the obstruction of the certification but rather, to the alleged attempt to deprive the grand jury of critical evidence.  *See* Indictment at 15.

Badalian contends for the first time in his reply brief that the allegations as to Count Three are insufficient because the indictment does not allege that the photographs and videos at issue in that count contain evidence of criminal conduct by him, and it alleges only that defendant three "attempted to have PERSON ONE transfer the photo and video files to a 'secure hard drive.'" Badalian Reply at 16.  It is a basic proposition that arguments raised for the first time in a reply brief are waived.  *United States v. Powers*, 885 F.3d 728, 734 (D.C. Cir. 2018); *United States v. Hassanshahi*, 195 F. Supp. 3d 35, 53 n.13 (D.D.C. 2016); *see Corson & Gruman Co. v. NLRB*, 899 F.2d 47, 50 n.4 (D.C. Cir. 1990) (arguments must be raised a party's "opening brief to prevent 'sandbagging' . . . and to provide opposing counsel the chance to respond").  But even assuming the motion put the government on notice of this challenge by Badalian to Count Three, his characterization of the allegations is inaccurate.  The indictment alleges that video footage taken by Person One showed Badalian attacking someone on the Lower West Terrace of the Capitol, Indictment at 12–13, and that Person One's photos and videos "include[ed] materials that showed [the three defendants] participating in the riot."  *Id.* at 14.  It also alleges that all three defendants went to Person One's house on January 10, 2021 to have Person One give them the photos and video.  *Id.* at 13.  Thus, Badalian's belated argument is without merit.  Moreover, the statute does not require that an individual must alter, destroy, mutilate, or conceal a record or document that incriminates him personally; it simply criminalizes altering or concealing material "with the intent to impair the object's integrity or availability for use in an official proceeding."  18 U.S.C. § 1512(c)(1).

Therefore, the motions to dismiss Count Three will be **DENIED**.

III.    **Count Ten alleges a violation of 18 U.S.C. § 1752.**

Defendant Badalian moves to dismiss Count Ten, which charges all three defendants with entering and remaining in a restricted building or grounds in violation of 18 U.S.C. § 1752(a)(1) and § 1752(b)(1)(A), on the grounds that he was not in a "restricted building."  Badalian Mot. at 19–24; *see* Indictment at 18.[7]

A.    **The Capitol was a "restricted building" under the statute on January 6.**

Section 1752(a)(1) states:  "Whoever . . . knowingly enters or remains in any restricted building or grounds without lawful authority to do so . . . .  or attempts or conspires to do so, shall be punished."  18 U.S.C. § 1752(a).

The phrase "restricted building or grounds" is defined in the statute:

> (1)    the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—
>
> > (A)    of the White House or its grounds, or the Vice President's official residence or its grounds;
> >
> > (B)    of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or
> >
> > (C)    of a building or grounds so restricted in conjunction with an event designated as a special event of national significance . . . .

18 U.S.C. § 1752(c).

Badalian contends that because the United States Capitol and its grounds are not "specifically included in the definition," he cannot be charged under the statute.  Badalian Mot.

---

7    Count Ten also charges that defendant Rodriguez "during and in relation to the offense, did use and carry a deadly and dangerous weapon, that is, an electroshock weapon and a flagpole." Indictment at 18.

at 20.  He also maintains that the Capitol cannot be considered to be "a building or grounds where the [Vice President] is or will be temporarily visiting" because "Vice President Pence . . . actually worked at the Capitol Building and grounds," and "had a permanent office 'within the United States Capitol and its grounds,' in his capacity as President of the Senate." *Id.*  Moreover, he adds, "[o]n January 6th, Vice President Pence was working -- he was presiding in the Senate chamber to count the electoral votes." *Id.*  Therefore, defendant argues, "§[]1752 does not apply as charged." *Id.* at 21.

      This strained interpretation is inconsistent with both the text and the structure of the statute.  The "first step in interpreting a statute is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson*, 519 U.S. at 340.  While this determination "does not turn solely on dictionary definitions of its component words," *Yates*, 574 U.S. at 537, "dictionary definitions . . . bear consideration." *Id.* at 538.  The Oxford English Dictionary defines "temporarily" as "[f]or a time (only); during a limited time." *Temporarily*, Oxford English Dictionary (2d ed. 1989); *see also Temporarily*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/temporarily ("during a limited time").  It defines "visit" as "a short or temporary stay at a place." *Visit*, Oxford English Dictionary (2d ed. 1989) (definition "d."); *see also Visit*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/visit ("to go to see or stay at (a place) for a particular purpose (such as business or sightseeing)").  Taken together then, as was plain even before the dictionary was consulted, the phrase "temporarily visiting" means being somewhere for a limited period of time, and there is no linguistic reason why the phrase could not include being there for a business purpose.

This definition obviously encompasses Vice President Pence's actions on January 6, 2021. He went to the Capitol with a discrete purpose:  to certify the Electoral College votes, a process that by law is contemplated to take one day.  *See* 3 U.S.C. § 15 ("Congress shall be in session *on the sixth day of January* succeeding every meeting of the electors.  The Senate and House of Representatives shall meet . . . at the hour of 1 o'clock in the afternoon on that day, and the President of the Senate shall be their presiding officer.") (emphasis added).  He remained in the Capitol until after the certification process concluded.  *See* Kyle Cheney, *Capitol Police:  Pence Remained on Capitol Grounds Throughout Jan. 6 Attack*, Politico (Feb. 4, 2022), https://www.politico.com/news/2022/02/04/jan-6-pence-remained-on-capitol-grounds-00005919.

Badalian insists that the Vice President could not have been "temporarily *visiting*" the Capitol on January 6th because he regularly *works* there, and because he was in fact working there on January 6th.  Badalian Mot. at 20 (emphasis added).  But defendant's simplistic assertion ignores not only the ordinary meaning of the statutory language, but also the structure of the definition in question.

A restricted building is defined to be, first, the White House or the Vice President's residence, and second, any place where those subject to Secret Service protection may be temporarily visiting.  *See* 18 U.S.C. § 1752(c)(1)(A)–(B).  This structure reflects that it is the White House and the Vice President's residence where the President and Vice President live and maintain their primary working offices, *see McHugh*, 2022 WL 296304, at *22, citing *The Vice President's Residence & Office*, The White House, https://www.whitehouse.gov/about-the-white-house/the-grounds/the-vice-presidents-residence-office/ ("[T]he Vice President's working office is in the West Wing of the White House."), and also that their duties may take them to multiple other locations within the District of Columbia and around the world where it is equally essential

that they be protected. *See McHugh*, 2022 WL 296304, at *21.  While the Vice President serves as President of the Senate, this is not the Vice President's daily responsibility, *see The President of the Senate's Role in the Legislative Process*, United States Senate, https://www.senate.gov/general/Features/Part_1_VP.htm ("The vice president presides over the Senate only on ceremonial occasions or when a tie-breaking vote may be needed."); indeed, on other occasions, the Senate designates one of its own members to preside.  *See The Executive Branch*, The White House, https://www.whitehouse.gov/about-the-white-house/our-government/the-executive-branch/.  The mere fact that the Vice President has a "ceremonial" office available when called upon to conduct business within the Capitol building, *see Capitol Building and Grounds*, Congressional Directory 573 (1999), https://www.govinfo.gov/content/pkg/CDIR-1999-06-15/pdf/CDIR-1999-06-15-CAPITOL.pdf, does not make the stay on the Capitol grounds any less temporary, and the fact that the Vice President has constitutional duties to perform there is not inconsistent with the ordinary understanding of a "visit." *See Andries*, 2022 WL 768684, at *16 ("[T]here are situations in which it would be quite natural to say that a person "temporarily visits" a place where she has an office:  consider a CEO of an international corporation who normally works from headquarters in New York, but who maintains an office for her occasional use at the firm's satellite location in London.").  Defendant's reading of the statute would result in a large, entirely illogical gap in its coverage, and it is not supported by the text or by the application of common sense.

The language in 18 U.S.C. § 1752(a)(1) and (2) is plain and unambiguous:  the term "restricted building or grounds" encompasses the United States Capitol, which the Vice President was "temporarily visiting" on January 6, 2021.  The Court will **DENY** Badalian's motion to dismiss Count Ten.

**B.      The Indictment satisfies the Fifth Amendment.**

Finally, defendant Badalian argues in the alternative that Count Ten should be dismissed because its language does not provide adequate notice or assurance that the grand jury made the determinations required by the Fifth Amendment.  Badalian Mot. at 22–24.  He complains that "the charges lack *any* specifics regarding the alleged acts or circumstances and contains only conclusory allegations," *id.* at 22 (emphasis in original), and "[t]he assembly-line indictments in the January 6th cases generally, and Mr. Badalian's case in particular, fail to fulfill either the notice or presentment requirements of the Fifth and Sixth Amendments."  *Id.* at 23.  He states that the Indictment charges him with using or carrying "a deadly or dangerous weapon or firearm" in violation of section 1752(b)(1)(A) but only identifies defendant Rodriguez and the weapons he allegedly carried.  *Id.* at 23–24.

"[A]n indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *Hamling*, 418 U.S. at 117.  "It is generally sufficient that an indictment set forth the offense in the words of the statute itself, as long as 'those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offence intended to be punished.'"  *Id.*, quoting *United States v. Carll*, 105 U.S. 611, 612 (1882).  While the language of the statute may be used to describe the offense, it must be accompanied with a statement of the facts and circumstances to inform the defendant of the specific offense being charged.  *Id.* at 117–18.

Here, paragraph 90 of Count Ten incorporates all the factual allegations as they pertain to the underlying facts of this case, Indictment at 18 (incorporating by reference paragraphs 1–17 and

22–72), and the actions of Badalian in particular as they relate to Count Ten.  *See id.* at 9–11 ("On or about January 6, 2021, after the rally, RODRIGUEZ and BADALIAN, bearing walkie talkies, walked down Pennsylvania Avenue to the Capitol. . . . At approximately 2:40 p.m., on or about January 6, 2021, RODRIGUEZ, BADALIAN and [DEFENDANT THREE] gathered with thousands of others at the Lower West Terrace of the Capitol building. . . . At approximately 3:45 p.m., on or about January 6, 2021, rioters broke the window to the left of the tunnel on the Lower West Terrace.  After the window was broken, [DEFENDANT THREE] climbed through the window and into the Capitol building, followed shortly by RODRIGUEZ and BADALIAN, uniting the three co-conspirators in room ST2M.").  So the indictment specifically alleged, at the very least, that Badalian "entered" what the Court has just determined was a "restricted building."  Further, paragraph 91 of Count Ten sets forth all of the elements of section 1752(a)(1).  *Compare* Indictment at 18 *with* 18 U.S.C. § 1752(a)(1).  The Indictment thereby enables Badalian to prepare a defense and plead that an acquittal or conviction is a bar to future prosecutions.[8]

As for section 1752(b)(1)(A), it is only Rodriguez, and not Badalian, who is charged with using and carrying a deadly weapon.  *See* Indictment at 18; Gov't Opp. at 35 n.6 ("Badalian's motion seems to suggest he is also charged with 18 U.S.C. § 1752(b)(1)(A).  He is not.  Only

---

8      There has been extensive discovery in this case, but in the event there is any lingering confusion about the particular facts underlying the charged offense, the remedy would be a request for a bill of particulars, not dismissal.  *See United States v. Butler*, 822 F.2d 1191, 1193 (D.C. Cir. 1987) (an indictment should be "stated with enough precision to allow the defendant to understand the charges" and "prepare a defense," and if it is not, a bill of particulars may be required); *United States v. Espy*, 989 F. Supp. 17, 34 (D.D.C. 1997) (the court should grant such motions when "necessary to prevent unfair surprise at trial"); *see also Ballestas*, 795 F.3d at 148 (dismissal of an indictment is to be granted "only in unusual circumstances").

defendant Rodriguez is charged with violating the deadly or dangerous weapon portion of Section 1752.").

For these reasons, Badalian's motion to dismiss Count Ten will be **DENIED**.

## CONCLUSION

For the reasons set forth above, defendants' motions to dismiss Counts Two, Three, and Ten [Dkt. ## 106, 108] are hereby **DENIED**.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  August 31, 2022