IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 21-cr-246 (ABJ) |
| | ) | |
| | ) | |
| EDWARD BADALIAN | ) | |

**<u>Defendant's Sentencing Memorandum</u>**

Edward Badalian, through his Attorney, Robert M. Helfend, pursuant to 18 U.S.C. § 3553(a), hereby files his Sentencing Memorandum with which he respectfully requests this Honorable Court to exercise its discretion and impose a varied sentence below that suggested by the advisory Sentencing Guidelines.

## I.    INTRODUCTION

Edward Badalian traveled to Washington, D.C. because he believed he was going to show his support to then President Trump, after the former President made several claims attacking the integrity of what we now know was a fair presidential election.

In the months prior to November 2020, Trump's falsehoods created a frenzy of anger and uncertainty in Mr. Badalian as well as in the ex-President's followers in the United States during what was already an insecure time at the height of the Covid-19 pandemic.

Edward was not aware that Trump, or the other orators,  would call the crowd to the Capitol during their speeches to the large mass of duped supporters. Once the idioms started at the Ellipse, Mr. Badalian was separated from the group he had traveled to D.C. with and found himself alone. He went by himself to the front of the stage. After the crowd was urged to go to the Capitol by the

President, Edward  followed the crowd to the Capitol, and he was unarmed.

Once at the Capitol, Mr. Badalian prevented a vandal from breaking an outside window of the building. The crowd surrounding this violent protester was shouting "Antifa." Edward shouted to the people around this protestor and  tried to thwart him.  He pulled him from the window ledge stating "We are not here to destroy buildings, but to arrest traitors." From this statement, the Court can deduce that Edward was not intent on destroying any property nor did he intend to engage in any violence. According to Mr. Badalian, potential force would only be utilized on "traitors" who resisted arrest by Edward after he was duly "deputized' to effectuate an arrest by law enforcement. A condition that did not occur and that was highly unlikely to arise.

Approximately 30 minutes later, Edward was called to a broken-out window by Gina Bisignano. According to Ms. Bisignano's somewhat unintelligible testimony, she told Mr. Badalian that Antifa was inside the Capitol building and possibly destroying property. Edward then went inside the structure.

While inside the Capitol, although Mr. Badalian did not attempt to prevent any damage to the inside of the Capitol, Edward did not destroy or steal any Government property, nor did he inflict any violent act upon anyone or anything. Edward spent approximately 4 minutes inside the building and exited immediately upon the command of a police officer.

It is unfortunate that Mr. Rodriguez assaulted a police officer and destroyed and stole government property. While Mr. Rodriguez was violent and assaultive, Edward did not assist or encourage him. There were no written communications between Edward and Mr. Rodriguez which would establish that Edward knew where Mr. Rodriguez was, and that Mr. Rodriguez was committing crimes.

When considering all the factors of Edward's offenses, his age, vocational experience,

close family ties and responsibilities, and lack of criminal history, we respectfully request that this Court impose a sentence of twelve (12) months house arrest, 5 years of supervised release, and 300 hours of community service.

Such a sentence is one that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing as required by 18 U.S.C. § 3553(a). *See Kimbrough v. United States*, 552, U.S. 85, 101 (2007). This kind of a sentence will satisfy the statutory goals of sentencing and will constitute a sentence that reasonably provides just punishment, protects the public, promotes respect for the law, affords adequate deterrence, and promotes rehabilitation as required by 18 U.S.C. § 3553(a)(2).

This memorandum:

(1)     addresses  factors set out in 18 U.S.C. § 3553(a), which the Court must consider in determining the sentence to impose;

(2)     sets out the reasons why the facts of this specific case are unique; and

(3)     explains why a sentence of more than home confinement would be excessive and result in unwarranted disparity.

## A. <u>Procedural History</u>

On April 4, 2023, this Honorable Court found Mr. Badalian guilty of 3 Counts of the 4 Count Indictment. Specifically, Edward was found in violation of  18 U.S.C. § 371, Conspiracy to Obstruct an Official Proceeding, 18 U.S.C. § 1512 (c)(2), Obstructing an Official Proceeding and 18 U.S.C. § 1752 (a)(1), Entering and Remaining in a Restricted Building, a misdemeanor.

Mr. Badalian was acquitted of  18 U.S.C. § 1512 (c) (1) Tampering with Documents or Proceedings.

## B. <u>Sentencing Under the Guidelines</u>

**1. Base Offense Level**

The guideline for 18 USC § 1512(c)(2) offenses is found in USSG §2J1.2 of the guidelines. That section provides that an offense involving obstruction of justice has a base offense level of 14. USSG §2J1.2(a). Probation has utilized a Level 14 and the base offense level of 14 is not in dispute.

**2. Specific Offense Characteristics**

**A. Threatening Physical Injury to a Person**

Probation has applied an 8-level enhancement under  USSG 2J1.2(b)(1)(B) finding that the offense involved causing or threatening physical injury to a person in order to obstruct the administration of justice.

Essentially, Probation, without citing any evidence from the Bench Trial, has asserted that Edward "encouraged other rioters to gain entry to the US Capitol and stop the certification." During Mr. Badalian's Bench Trial there was no evidence that he encouraged anyone to go inside the Capitol building. He is seen on video surveillance chanting along with the crowd during the "heave-ho" conflict at the West Terrace Tunnel and perhaps directing unknown demonstrators to go in certain directions, but to whom Mr. Badalian is communicating with and where he was, perhaps directing these people to go, was undetermined in the evidence at trial.

Specifically, no one who traveled to Washington D.C. in the van with Edward was with him while he was on the Capitol grounds, with the exception of Mr. Rodriguez.

The probation officer and the government are conflating the conduct and facts that apply to Mr. Rodriguez solely and imputing them to Mr. Badalian.  Regarding Mr. Rodriguez, Probation justified an additional 8 - point enhancement because Edward "conspired with Defendant Rodriguez, who was responsible for the assault of law enforcement and the destruction of

4

property." While this statement is true in the abstract, it is not accurate factually. It is accurate that Mr. Badalian communicated on the Telegram app with Mr. Rodriguez about the state of the country and the "stolen" election. They also conversed about utilizing physical practices to stop "traitors" and to come to D.C to attend the rallies. Mr. Badalian and Mr. Rodriguez helped to encourage individuals in their Telegram group, to come to D.C for the rallies on January 6, 2021.

However the violence propounded by Mr. Rodriguez was not supported or encouraged by Edward nor was it condoned at any time later on. Mr. Badalian went to the front of the crowd while at the Ellipse when the speakers began their diatribes. He was separated from Mr. Rodriguez sometime during this time. There was testimony that Mr. Badalian's walkie talkie lost power and there was no known communications between Edward and Mr. Rodriguez when Edward was walking towards the Capitol nor at any time that Mr. Rodriguez was perpetrating his crimes while at the Capitol building.

Mr. Badalian had no idea that Mr. Rodriguez was handed a taser by a member of the crowd or that Mr. Rodriguez had used this weapon on the neck of Officer Fanone. It is true that Edward and Mr. Rodriguez were in the Capitol building accessible from the West Terrace, at the same time. Mr. Rodriguez was in a separate room using a flagpole to break out the window towards the crowd from the inside. At this time, Edward is not seen in any video being in this room nor is there evidence that Mr. Badalian was encouraging this act of violence.  The evidence at trial showed that while Mr. Rodriguez is in another room of the Capitol building stealing Government property, Edward is nowhere in this vicinity, having left the Capitol building on his own accord after being asked to do so by a law enforcement officer.

Thus, the 8-level upward adjustment sought by Probation is not supported by the evidence and should be rejected by this Honorable Court.

**B. Substantial Interference**

Since the Joint Session of Congress was halted due to the rioting and congregating of the whole group's conduct at large, Probation has recommended another 3 – point increase in base offense level reasoning that the offense resulted in substantial interference with the administration of justice under USSG § 2J1.2(b)(2). While it cannot be denied that Congress was substantially interfered with, it was not Edward's action which caused this delay.

Vice President Pence was moved from his position in the Capitol before Edward entered the building. Mr. Badalian's 4 - minute venture inside could hardly be found to be the act which substantially interfered with the function of Congress. It took Capitol Police hours to clear the people who remained in the Capitol building after Edward departed. The Police also utilized another 2 hours to sweep the building to ensure the Capitol's safety for the members of Congress. It cannot be assumed that Edward's actions in the 4 - minute misadventure into the Capitol building resulted in the substantial interference with the administration of justice.

Mr. Badalian is aware that Congress could not resume until every person was evacuated from the Capitol. Edward was amongst these people for 4 minutes.

Finally, Mr. Badalian contends that the electoral certification did not involve the "administration of justice" and that the certification is merely ceremonial. In fact, the "certificates and papers purporting to be certificates of the electoral votes . . . [are] opened, presented, and acted upon in the alphabetical order of the States." 3 U.S.C. § 15.

Following the reasoning of another Judge in this Court, Judge McFadden in USA v. Hunter Seefried, 21-cr-287 (TNM) found:

"The Court acknowledges that this is a close interpretative call. If the Sentencing Commission had foreseen the Capitol breach, it may well have included "official proceeding" in

the text of § 2J1.2. But the Commission did not…But for all of these reasons, the Court finds that Seefried did not obstruct, impede, or interfere with the "administration of justice" and that the enhancements in § 2J1.2(b)(1)(B) and (b)(2) are inapplicable."

Behind this logic, Edward requests that the Court find that the certification of the electoral votes was not an "official proceeding"  and deny Probation's request for a 3 - point increase in base offense level.

Should this Court not agree with the finding by Judge McFadden, Mr. Badalian would request that the Court overrule the request by Probation to increase his base offense level by 3 points for the substantial interference with the administration of justice based on the arguments above.

**C. Offense was Extensive in Scope**

Probation has maintained that Mr. Badalian's offense was otherwise extensive in scope. Finding that Edward conspired with others through social media and group texts encouraging them to participate in the riot, to travel cross country and was involved in the collection of weapons before arriving at the US Capitol. Probation has requested a 2  - point enhancement under USSG §2J1.2(b)(3)(C).

Turning to Mr. Badalian's bench trial, the facts indicate that only 1 person who traveled to D.C. with Edward went onto the Capitol grounds and/ or into the Capitol building. Neither Mr. Badalian nor Mr. Rodriguez came to the speeches and then to the Capitol with any of the weapons that were in the van which traveled to D.C.

Edward did ask others in the Telegram group to drive with him in the van in order to defray the cost of traveling by automobile from Los Angeles to Washington D.C. The only person who traveled to D.C. with Edward or who met Mr. Badalian on January 6, 2021 and

7

participated in the riots was Mr. Rodriguez. As stated previously, Mr. Rodriguez's criminal activities were not foreseeable nor were they aided or encouraged by Edward.

For these reasons, Mr. Badalian urges this Court to deny Probation's request for a 2 – point increase in base offense level under USSG §2J1.2(b)(3)(C).

### 3. Role in the Offense, PSR paragraph 27

Probation has asked the Court to add 2 points for Edward's role in the offense. The PSR states that Mr. Badalian encouraged others to rally in the chat group, that he arranged for transportation, and that his "physical actions" during the riots warrant an aggravating role pursuant to § 3B1.1(c). In order to determine if this adjustment is warranted, application note 4 gives the Court direction. It states in part: "Factors the court should consider include the exercise of decision-making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, …the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. *See United States v. Woods*, 335 F3d 993 (9th Cir. 2003)(reversing where government failed to show that defendant managed or supervised any other participant in the fraud).

It is accurate that Mr. Badalian encouraged other Telegram users to come to Washington D.C. on. January 6, 2021. But it was a telegram chat group, not a physical meeting where he controlled others. He did help organize the trip to DC, but he did not exercised control over others. He had little decision making authority other than his own actions. Although he rented the vehicle to drive from Los Angeles to D.C., his concern was for cost, not to encourage others to commit a crime with him. Rodriguez was equally involved in getting the rental car.

Once the group arrived at the area of the speeches at the Ellipse, Edward left them and did not meet up with anyone from the Telegram group until after the crowd was disbursed from the

Capitol grounds. Mr. Rodriguez was the only person from the traveling party to D.C. to go onto Capitol grounds and into the building. Mr. Rodriguez acted alone and not with the assistance of Edward Badalian.

Mr. Badalian's crime was his entry into the Capitol building. That act was accomplished without any help or concert of any of the other persons who went to D.C. in Edward's vehicle or who met up with Mr. Badalian on January 6, 2021. A two-level sentencing enhancement under the sentencing guidelines for being organizer of criminal activity does not apply where the actor is sole participant in offense.

Here, Edward acted alone when he went into the Capitol building. No one other than Mr. Rodriguez went inside. Mr. Rodriguez and Edward were not in contact with each other during Mr. Rodriguez's crime spree. The two of them are not seen on camera communicating with each other during Mr. Rodriguez's misdeeds. As such, the 2-point enhancement to Edward's base offense level under USSG §3B1.1(c) should be denied.

**4. Obstruction of Justice, paragraph 30 PSR**

Probation has argued that Edward willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense. The probation officer states that Mr. Badalian committed perjury. Probation asks the Court to impose another 2 - point increase to the base offense level under USSG §3C1.1.

Edward was acquitted of  18 U.S.C. § 1512 (c) (1) Tampering with Documents or Proceedings. The Court found that Mr. Badalian did not try to destroy evidence which could implicate him in his actions on January 6, 2021. A Court may apply this enhancement only upon a finding by clear and convincing evidence that Mr. Badalian "gave false testimony concerning a

material matter with the willful intent to provide false testimony, rather than as a result of mistake or faulty memory."  *See United States v. Gaviria*, 116 F.3d 1498, 1518 (D.C. Cir 1997).

Mr. Badalian claimed at trial that he entered the Capitol at the invitation of Ms. Bisignano who told him that "Antifa" was inside destroying the contents of the rooms.  Although Edward's testimony was corroborated by Ms. Bisignano, even if some of her testimony was false and incredible, Mr. Badalian's assertions were not material. Finally, Edward contends that there was no showing that this purported falsehood was willful.

As of the date of this writing, Counsel has not received any information from the Government regarding any other specific testimony that the Government has found to be untrue which would qualify as material and given with willful intent.

Thus, Probation's request for a 2 point increase in base offense level should be denied.

### 5. Acceptance of Responsibility

The Court should be made aware that Mr. Badalian communicated to the Government, his desire to plead guilty to one felony count before trial. The Government rejected this offer and Edward conducted his trial before Your Honor.

By Conveying an early willingness to plead guilty, Mr Badalian should be entitled to a 2 – point reduction of his offense level under the provisions of acceptance of responsibility under USSG §3E1.1.

### 6. Defense Calculation

As stated above, Probation has utilized a Level 14 and the base offense level is not in dispute.

Depending on the rulings of the Court, Edward's total offense level could be as high as a 31, as advocated by Probation or as low as a 14. These offense levels correspond to 108 – 135

months down to 15 to 21 months.

However, Mr. Badalian urges the Court to vary downwards from these corresponding sentencing ranges utilizing the Court's power to do so based on the particular circumstances of this case and the nature and characteristics of Edward Badalian.

## II.    ARGUMENT

### A. Booker and 18 U.S.C. 3553(a)

The decision of the United States Supreme Court in *United States v. Booker,* 125 S. Ct. 738 (2005), has rendered the United States Sentencing Guidelines "effectively advisory." *Booker* at 759-67.   Pursuant to *Booker,* sentencing courts are required to consider a Defendant's guideline range, but may "tailor the sentence in light of other statutory concerns as well." *Id.* at 767 *(citing* 18 U.S.C. § 3553 (a)).

As a result of *Booker* federal district courts must consider the seven factors set forth by 18 U.S.C. § 3553 (a) in determining a sentence:

(1)    the nature and circumstances of the offense and the history
and characteristics of the defendant;

(2)    the need for the sentence imposed -

(A)    to reflect the seriousness of the offense, to promote respect
for the law, and to provide just punishment for the offense;

(B)    to afford adequate deterrence to criminal conduct;

(C)    to protect the public from further crimes of the defendant; and

(D)    to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most
effective manner;

(3)    the kinds of sentences available;

(4)    [the applicable Sentencing Guidelines];

11

(5)     any pertinent [Sentencing Guidelines] policy statement;

(6)     the need to avoid unwarranted sentence disparities among defendants
        with similar records who have been found guilty of similar conduct;
        and

(7)     the need to provide restitution to any victim of the offense.

Moreover, § 3553(a) and the 'parsimony provision' mandate that the District Court "impose a sentence sufficient but not greater than necessary," to comply with the purposes of sentencing set forth in § 3553(a)(2). Sufficiency of a sentence rather than excessiveness is echoed in 18 U.S.C. § 3582, which recognizes that "imprisonment is not an appropriate means of promoting correction and rehabilitation."

Under the advisory Guideline scheme, "district courts have a freer hand in determining sentences." *United States v. Trujillo-Terrazas*, 405 F.3d 814 (10th Cir. 2005). Thus, "while the Guidelines still exert gravitational pull on all sentencing decisions . . . district courts now have more discretion to tailor sentences to the individual circumstances of a defendant." *Id*. *See also United States v. Menyweather*, 431 F.3d 692 (9th Cir. 2005) (finding that "[i]n the 'broader appraisal,' available to district courts after *Booker*, courts can now . . . have the discretion to weigh a multitude of mitigating and aggravating factors that existed at the time of mandatory Guidelines sentencing, but were deemed "not ordinarily relevant," such as age, education and vocational skills, mental and emotional conditions, employment record, and family ties and responsibilities).

Under *Booker* and *Gall*, "[t]he sentence is to be "individualized" and the Court must consider all of the sentencing factors enumerated in 3553(a) and "make an individualized assessment based on the facts presented." *Booker*, 125 S. Ct. 738 (2005); *Gall v. United States,* 552 U.S. 38, 50 (2007). While it may be a distinction without much difference, there

is, in fact, a distinction between a sentence that results in a variance from the Guidelines based upon the Court's consideration of all the 3553 factors, and a sentence that is applied below the Guidelines as a result of certain downward departures found within the Guidelines. *See Irizarry v. United States*, 553 U.S. 708, 709 (2013); *see also Pepper v. United States*, 131 S. Ct. 1229, 1247 (2011).

For the reasons set forth above and below, Mr. Badalian's circumstances justify a significant downward adjustment based on relevant variance grounds found in the 3553(a) factors.

**B. Applying the Factors Contained In 18 U.S.C. § 3553(a)**

  **i.**  <u>**History and Characteristics of the Defendant**</u>

Edward Roman Badalian was born to Roman Badalian and Lucy Demirchyan on September 21, 1994, in Los Angeles, California. Ms. Demirchyan is 52 years old and lives in the Los Angeles, California area. She is a hairdresser and is healthy. Edward's father is 54 years old and lives in Moscow, Russia. He reportedly owns a limousine service and a restaurant. Edward has no contact with and no additional information regarding his father.

Mr. Badalian and Ms. Demirchyan were married prior to Edward's birth and divorced prior to his first birthday. Edward's father returned to Russia when Mr. Badalian was eight years old. Edward has not spoken to his father in approximately three years.

Edward grew up as a member of a household without the influence of a male parental influence. The Government has acknowledged through their Indictment of the Former President that Mr. Trump bears some responsibility for Obstructing an Official Proceeding by encouraging his followers to descend on the Capitol after the diatribes concluded. Finding a dominant male that Mr. Badalian could relate to, Edward came to D.C. to watch the speeches at the Ellipse. At

that time, Trump and his minions asked the participants to walk to the Capitol. During the time leading up to this command, Trump parroted that the election was stolen. Having no other trusted and overriding male in his life, Mr. Badalian believed Trump's lies.

Edward should have known better than to enter the Capitol building. He did not use violence upon any law enforcement personnel protecting the Capitol or destroy any object belonging to the Government, nor did he steal any Government property. He did not suit up for combat nor did he carry a weapon.

As is evidenced in the letters of support submitted on Edward's behalf, Mr. Badalian is relied upon by his family. Friends, extended relatives, and neighbors all send letters reflecting on his caring nature, respectfulness, and morality. The people in his life recognize that Edward puts their needs before his own, sometimes to his detriment.

Mr. Badalian has provided motivation for family members and demonstrated a strong work ethic. He has positive plans for his future and wants to be a productive citizen.

ii.     ***Work History***

Edward has worked for his uncle's company, Payless Kitchens/LA Kitchen Cabinets, since he was 16 years old as a cabinet assembler. This job has recently been sporadic based on the work available. Edward noted that business has been slow recently, and he has not had many assignments. His pay was based on the job.

From 2015 to 2016, Mr. Badalian worked for Apex Systems in Los Angeles, California, doing information technology. Specifically, he upgraded computers for contracted companies. It was contract work, and the pay was based on the job.

The remainder of his employment history consists of various odd jobs, including rideshare driver, pizza maker and delivery driver, eBay store attendant, and employee at his

father's restaurant in Russia.

Edward has a keen skill in building motorized bikes from the frames of current pedal powered bicycles. Copies of photos of Mr. Badalian's work are attached as exhibits to these moving papers. Edward desires to continue with his passion of building these motorized bicycles from scratch and sell them to the public.

### iii.    *Acceptance of Responsibility*

Although Edward conducted a Court trial, he did offer to plead guilty before trial to 1 felony count instead of the 2 counts that the Government insisted on. Perhaps this behavior can be deemed to be extraordinary under 3E1.1, comment 4, "There may, however, be extraordinary cases in which adjustments under both §§ 3C1.1 and 3E1.1 may apply."

A sentence of twelve months home confinement would be "sufficient but not greater than necessary," to comply with the purposes of sentencing set forth in § 3553(a)(2).

### iv.    *Criminal History*

As the Probation report notes, Edward has no prior convictions which results in a Criminal History Category of I.

Under Prospective Guideline Section 4C1.1, Mr. Badalian would be in line for a possible –2 reduction if the Court rules that Edward did not receive an adjustment under § 3B1.1 (aggravating role). (This newly created Guideline will be imposed retroactively and will only become available in February, even though the new Guideline will apply prospectively starting Nov. 1.)

### v.    *The Need for the Sentence Imposed*

Section 3553(a)(2) lists the four purposes of sentencing, which can be summarized as: just punishment, deterrence, protection of the public, and rehabilitation.

### a. Just Punishment

A downward varied sentence for a 28-year-old man, with no criminal history, and a large circle of family and friends that want him to excel and need him, would satisfy the goals of sentencing. Edward strives to do better in the future. The advisory guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." *See United States* v. *Johnson,* 964 F.2d 124,125 (2nd Cir. 1992). Mr. Badalian has already been punished just by virtue of having his name smeared across the internet, which is permanent, his inability to get a job because of a felony conviction, and the fact that supervised release is no cake walk. Any term of supervision involves significant restraints on [Edward's] liberty. [Mr. Badalian] must periodically report to the probation officer, permit the officer to visit [his] home and jobs at any time, and follow the officer's advice. *Jones v. Cunningham,* 371 US 236, 242 (1963). Defendants are admonished to keep good company and good hours, work regularly, keep away from undesirable places, and live clean, honest, and temperate lives. *Ibid.* Not only must they faithfully obey these restrictions and conditions, but they also live in constant fear that a single deviation, however slight, might result in being sent to prison. *Ibid.*

Defendants might be rearrested any time the probation officer only believes they have violated a term or condition of probation. *Ibid.* They might have to serve all of the time that was suspended with few, if any, of the procedural safeguards that normally must be provided to those charged with crime. *Ibid.* Supervised release significantly restrains defendants' liberty to do the things that free people in this country are entitled to do. *Ibid.*

### b. Deterrence

Mr. Badalian has been a productive and beneficial member of society. He recognizes and

accepts that he has violated Federal Law.  He understands that the Court will fashion a sentence which the Court deems appropriate. However, he also acknowledges and assents that he will not participate in the same behavior in the future.

### c. Protection of the Public

Any argument that Edward is a danger to the community is contradicted by the productivity he has demonstrated through his employment, his caring and loving nature with his family and community, Edward's lack of any criminal history and the facts and circumstances of this case.  In the instant case, Mr. Badalian went into the Capitol building for 4 minutes. Once inside, he did not exert any violence upon any person, nor destroy or steal any Government property. Edward promptly left the premises upon the request of a police officer. He has been compliant with his pretrial release conditions which show that he can follow this Court's orders and conditions of release.

Mr. Badalian was not involved with the execution of Mr. Rodriguez's crimes. Edward did not foresee that Mr. Rodriguez would tase a police officer as Rodriguez did not bring any weapons with him to the speeches. Edward was not present when Mr. Rodriguez destroyed a Capitol window and confiscated Government property. Mr. Badalian's conduct through his life before becoming entangled in this matter suggests that the public need not be protected from him. *See United States* v. *Thomas,* 595 F. Supp. 2d 949, 952 (E.D. Wis. 2009) (wherein a probationary sentence was imposed despite a guideline recommendation of imprisonment).

Edward recognizes and accepts that he had a lapse of good judgement.  He understands that a sanction is appropriate.  However, he also recognizes and accepts that he will not engage in the same conduct ever again.

With regards to rehabilitation, 18 U.S.C. § 3582 rejects the notion that imprisonment is an appropriate means of promoting correction or rehabilitation:

> The court, in determining whether to impose a term of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length of the term, shall consider the factors set forth in section 3553(a) to the extent that they are applicable, recognizing that imprisonment is not an appropriate means of promoting correction and rehabilitation.

In following this provision, the advisory sentence contained in Mr. Badalian's PSR would not promote rehabilitation. A downward, varied sentence of home confinement that would allow him to work would be the more appropriate sentence for Edward.

### vi.   The Kinds of Sentences Available

Pursuant to *Booker*, this Honorable Court has significant discretion in fashioning a sentence that is "reasonable" based on § 3553(a), including incarceration and supervised release. In the instant case, a guidelines prison sentence would contravene 18 U.S.C. § 3553(a) and the 'Parsimony Provision' which proscribes the imposition of a sentence that is greater than necessary to achieve the statutory goals as set forth above.

Mr. Badalian respectfully requests that the Court sentence him to 12 months home confinement. This will be sufficient to deter Edward from ever committing another criminal act.

### vii.   Avoiding Sentence Disparity

Comparing Edward's conduct to that of the other individuals below who were convicted of only an 18 U.S.C. § 1512(c)(2) offense, the Court can see why a Sentence of home confinement is "Sufficient, but not Greater than Necessary."

18

1.  <u>USA v. Paul Hodgkins</u> 1:21-CR-00188-RDM, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 8 months' incarceration, 24 months' supervised release, $2000 restitution. Hodgkins entered the Capitol wearing a backpack containing protective eye goggles, rope, and white latex gloves, among other items. He made his way to the heart of the proceeding that he has pleaded guilty to obstructing – the Senate chamber – where he took "selfie-style" photographs and saluted others who were shouting and cheering from a nearby raised platform in the well of the chamber. Mr. Badalian was inside the Capitol for 4 minutes and did not go beyond the 2 rooms which were accessible to him. Certainly, nowhere near the Senate chamber.

2.  <u>USA V. Jacob Chansley</u> 1:21-CR-00003-RCL, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 41 months' incarceration, 36 months' supervised release, $2000 restitution. Mr. Chansley, unlike Edward was the poster child of the January 6 protestors. Mr. Chansley painted his face and dressed in a distinctive outfit to draw attention to himself. Mr. Chansley spent considerable time in the Capitol and went into individual offices in the building.

The so-called Q-Anon Shamon, Mr. Chansley scaled the Senate dais, taking the seat that Vice President Mike Pence had occupied less than an hour before. Then Mr. Chansley proceeded to take pictures of himself on the dais and refused to vacate the seat when Officer K. R., the lone law enforcement officer in the Chamber at the time, asked him to do so. Instead, Mr. Chansley stated that "Mike Pence is a fucking traitor" and wrote a note on available paper on the dais, stating "It's Only A Matter of Time. Justice Is Coming!"

A far cry from the behavior that Mr. Badalian exhibited at the Capitol.

3.  <u>USA v. Christine Priola</u>, 1:22-CR-00242-TSC, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 15 months' incarceration, 12 months' supervised release, $2000 restitution. Ms. Priola went inside the Senate chamber and encouraged other rioters to follow her

actions. Mr. Badalian was nowhere near the Senate chamber and did not encourage others to join him once he was inside the Capitol.

4. <u>USA v. Joshua Hughes</u>, 1:21-CR-00106-CKK, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 38 months' incarceration, 36 months' supervised release, $2000 restitution.

Jerod and Joshua were among the first rioters to enter the U.S. Capitol building on January 6, 2021. After kicking open the door, Jerod joined Joshua and continued walking northeast through the Capitol. Jerod and Joshua eventually encountered U.S. Capitol Police Officer E.G. standing guard near a staircase leading up to the Senate Chamber. Jerod and Joshua followed close behind other rioters who chased Officer E.G. up the staircase, despite Officer E.G.'s repeated pleas to stop and back up.

Upon reaching the second floor, Jerod, and Joshua, together with the other rioters, followed Officer E.G. into the Ohio Clock Corridor, where they were met by other U.S. Capitol Police officers who had come to Officer E.G.'s aid. During this stand-off with U.S. Capitol Police officers in the Ohio Clock Corridor, Jerod can be seen screaming and making aggressive gestures toward the officers. After the stand-off with officers in the Ohio Clock Corridor, Jerod and Joshua made their way toward the Senate gallery on the third floor of the U.S. Capitol building.

At approximately 2:48 p.m., Jerod and Joshua entered the Senate chamber through the east doors, which had been opened from the inside by another rioter. They walked among the senators' desks for approximately two minutes, and exited the Senate chamber at approximately 2:51 p.m.

Mr. Badalian had no confrontations with Police Officers. After entering the Capitol for 4 minutes, Edward exited upon the request of an unidentified D.C. Police Officer.

5. <u>USA v. Nicholas Decarlo</u>, 1:21-CR-00073-BAH, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 48 months' incarceration, 36 months' supervised release, $2000 restitution, and a $2,500 fine.

Ochs and DeCarlo joined the physical attacks on the embattled police officers. DeCarlo threw a smoke grenade at the police, and exclaimed, "Oh fuck, I just threw it without pulling the pin. God damn it." Ochs threw a smoke bomb too. On the West Terrace staircase, DeCarlo turned toward the crowd behind him and yelled, "Let's go!" Reaching the Upper West Terrace, they filmed the large crowd gathered below. DeCarlo said, "you think they are scared in there?" Ochs replied, "yeah, and I fucking love it!"

At approximately 2:23 p.m., Ochs and DeCarlo entered the Capitol through the Senate Wing Doors as alarms blared. They entered the Senate Spouses' Lounge. DeCarlo cackled, "isn't this nice. What a lovely room." Ochs and DeCarlo took selfies seated at a conference room table. DeCarlo commented, "Congress goes into lockdown." He then began to yell, "Where's Nancy? Where you at, Nancy?" He yelled, "What else can we take?" and then joined chants of "Our house," Ochs and DeCarlo milled around the Rotunda. At one point, they motioned toward an exit from the Rotunda that led toward Speaker Pelosi's office, yelling "Nancy's office!"

Ochs and DeCarlo remained in the Capitol menacing around for approximately 45 minutes. Mr. Badalian, who did not yell out snarky phrases of rebellion, stayed in the Capitol for 4 minutes.

6. <u>USA v. Nicholas Ochs</u>, 1:21-CR-00073-BAH, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 48 months' incarceration, 36 months' supervised release, $2000 restitution, and a $5,000 fine. See Nicholas DeCarlo above.

7. <u>USA v. Jerod Hughes</u>, 1:21-CR-00106-TJK, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 46 months' incarceration, 36 months' supervised release $2000 restitution. See Joshua Hughes above.

8. <u>USA v. John Andries</u>, 1:21-CR-00093-RC, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 12 months' and 1 day incarceration, 36 months' supervised release, $2000 restitution.

Video footage depicts Mr. Andries entering the Capitol thorough a broken window. Once inside the building, Mr. Andries appears to be pushing back at U.S.C.P. Police Officers. At one point, Mr. Andries turns back to the crowd and waves his arms back and forth. Surveillance depicts Mr. Andries coming up to U.S.C.P. Police Officers and getting within inches of their faces.

Edward remained in the Capitol for far less time as Mr. Andries and never confronted Police Officers. Mr. Badalian never encouraged others to follow him into the Capitol before or after he entered the building.

9. <u>USA v. Andrew Alan Hernandez</u>, 1:21-CR-00445-CKK, Convicted of 18 U.S.C. § 1512(c)(2) and received a sentence of 18 months' incarceration, 36 months' supervised release, $2000 restitution.

Mr. Hernandez entered into the Capitol through the East Rotunda door, parading up the stairs and hallways and then made entry into the Senate Gallery.

10. Variant sentences have been given by other Courts, and by this Court in *United States v. Black,* 21-127(ABJ).  Unlike Mr. Badalian, Mr. Black made it to the Senate floor. He received a sentence of 22 months.  In *U.S. V. Nassif,* 21 CR 421 (JDB),  the defendant received a downward variance and a sentence of seven months from this Court despite the fact that he lead chants, encouraged other rioters to keep fighting, waved people in and testified falsely at trial. *U. S. v. Santos, 21 CR 47(RDM),* a 4 month sentence was imposed. Mr. Santos posted a video selfie and said "we took over this mother------ we took over this capitol."1 In *U.S. v. Alford*, 21 CR 263 (TSC) a 12 month sentence was imposed. Mr. Alford posted two Facebook posts while in the Capitol about Ashley Babbit being shot. *See* ECF 108, gov't sentence memo.  He also posted a photo saying "off with their heads/stop the steal."  He mocked police officers comparing them to Paul Blart the mall cop. Alford testified at trial and was not honest. *Id*. at p. 11-12. And in *U.S. v. Rivera*, 21 CR 60 (CKK), a 9 months sentence was imposed. Defendant Rivera posted on Facebook during his march to the Capitol, was told he shouldn't be at the Capitol and proceeded anyway, he yelled to a nearby rioter that he would "pull their asses out of there…this is the only f***** way." *See* gov't sent memo ECF No. 69, p. 7. He continually mocked Capitol police days after he came home from January 6. *Id.*

As stated above, Mr. Badalian's entry was confined to 2 rooms on the West side of the building. His trespass was for 4 minutes and involved no violence, destruction and/ or theft of Government property.

### III.    Conclusion

Wherefore, considering all the reasons above, and those presented at the sentencing

hearing, Mr. Badalian respectfully requests that this Honorable Court exercise its discretion and impose a downward variance.  Edward requests that he be given a sentence that is reasonable, but not greater than necessary and accounts for his contributions to society and respectfully requests that the Court sentence Mr. Badalian to home confinement, 5 years supervised release and 300 hours community service.

Respectfully submitted,

By:     /s/ *Robert M. Helfend*
Robert M. Helfend
California Bar No. 113380
23838 Pacific Coast Hwy., No. 309
Malibu, CA 90265
310-456-3317
rmhelfend@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify on the 15th day of September, 2023, a copy of same was electronically filed using the CM/ECF system and thus delivered to the parties of record and pursuant to the rules of the Clerk of Court.

_/s/Robert.Helfend_
ROBERT M. HELFEND
ATTORNEY FOR DEFENDANT
EDWARD BADALIAN

25