**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-246-2 (ABJ)** |
| **EDWARD BADALIAN,** | |
| **Defendant.** | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

*"We need to violently remove traitors and if they are in key positions
rapidly replace them with able bodied Patriots."*
Edward Badalian, December 21, 2020, 2:55 PM, Exhibit 904.03.

Edward Badalian planned for January 6, 2021 for weeks.   He trained, collected weapons, and traveled across the country for the riot, with the goal of arresting and "violently removing" politicians he disagreed with.   On January 6, 2021, he joined his coconspirator and a mob of rioters in invading the U.S. Capitol building.   For the reasons set forth herein, for his convictions for Conspiracy, Obstruction of an Official Proceeding, and Entering and Remaining in a Restricted Building or Grounds, the United States requests that this Court sentence Badalian to 121 months of incarceration, 36 months of supervised release, $2,000 in restitution, and a special assessment of $225.   The United States recommends that Badalian be sentenced at the midpoint of his advisory Guidelines range of 108–135 months, to reflect the seriousness of Badalian's conspiratorial conduct, including his planning and preparations with Daniel Rodriguez for the attack on the U.S. Capitol on January 6th, the need to promote respect for the law, and the need to deter Badalian and any other individuals who may pick up his mantle in the future.

I.      **FACTUAL BACKGROUND**

A.      **The January 6, 2021 Attack on the Capitol**

The government refers the Court to the Statement of Offense filed in the case of Badalian's codefendant, Daniel Rodriguez, ECF 160 at ¶¶ 1–7, for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

B.      **Badalian's Role in the January 6, 2021 Attack on the Capitol**

*Preparing for Violent Revolution After the 2020 Election*

In the fall of 2020, Badalian was the owner of a Telegram group chat titled PATRIOTS[45]MAGA Gang.   The group, initially created to bring together supporters of then-President Trump in the lead-up to the 2020 presidential election, became a breeding ground for Badalian's plans for violence against the seat of the federal government.   In that group, Badalian and his coconspirator, codefendant Daniel Rodriguez, wrote hundreds of messages discussing and planning for a violent revolution in which they personally planned to be at the forefront of a fight to overthrow government leaders they identified as traitors and tyrants.

Badalian made his intent clear in the hours following Election Day 2020.   As soon as the polls were closed on the presidential election, Badalian had a target: Joe Biden.   On the morning of November 4, 2020, in his first post after the election results came in, Badalian wrote, "time to arrest biden lol."   Exhibit 901.04.[1]   The next day, making clear that he was calling for the use of

---

[1]  Government exhibits offered at trial retain the same numbering.   Additional exhibits are numbered in a 1400-series and are being separately provided to the Court.

violence, Badalian sent the group a photograph of an individual holding an assault rifle.   He wrote, "stay strapped foo.   its not a game anymore."   Exhibit 901.05.   Days later, Badalian escalated from talk of arrests to calls for executions. On November 9, 2020, he wrote, "It theyre guilty of treason they should be executed," adding, "Biden is definitely guilty of treason."   Exhibit 901.23.

Continuing with his militant fantasies, on November 19, 2020, Badalian wrote, "The conditions of war are set and the left brought this lose lose onto themselves.   Concede your theft or lose everything."   Exhibit 902.04.   His coconspirator, Rodriguez, initially resisted, "Yes Ed but we'd murder them.   We'd go wild like Billy the Kid fighting corruption."   Exhibit 902.05. Badalian was undeterred: "the time is now but if our leaders never recognize it, we will never be activated.   Theyre currently targeting, threatening, attacking and killing Patriots we cannot wait any longer."   *Id.*   When Rodriguez expressed concern about going to jail, Badalian responded, "im not saying right now DJ im saying we need to makenour intent very clear.   we intend to arrest enemies of the Free State and must train for it alongside whatever we are doing with our lives." Exhibit 902.06.   Badalian fancied himself authorized to dispense vigilante justice, claiming, "we dont have to kill any of em, just arrest and drag into court under a litany of charges."   Exhibit 902.09.   Badalian made clear that he felt himself authorized to use force: "we need organization, to orchestrate arrests.   Surgical force not brute force."   *Id.*

On December 3, 2020, Badalian again expressed his desire for violent revolution: "how about we grow a pair and water that Tree of Liberty with tyrant blood again?"   Exhibit 906.03. He continued, "at this point, id rather have the revolution break out and have China attack than keep this all peaceful.   use the 2nd amendment or lose it."   *Id.*   That same day, he wrote, "if our

charge of treason has no teeth were fucked."   He added, "if you cant kill traitors youre fucked." Exhibit 906.10; *see also* Exhibits 906.19; 906.20; 906.27; 903.22; 903.24.

At the same time Badalian was eagerly anticipating violence, he was closely following the efforts by then-President Trump's campaign and his allies to contest the results of the election. Badalian was also well aware of the procedures for contesting the election in Congress.   On December 14, 2020, Badalian wrote, "contested election.   send it to the delegations.   we have 27-22."   Exhibit 903.11.   Rodriguez chimed in with his approval and echoed Badalian's call for war: "We won't allow criminals to run this country anymore.   1776[45]Forever!   If it's the last thing some of us ever do."   *Id.*

Trial testimony corroborated that Badalian was well versed in the efforts to overturn the election result and to contest the outcome in Congress.   *See* Trial Tr. 129:11–22 (Almonte testimony regarding how closely people in the PATRIOTS[45]MAGA Gang Telegram group, particularly Badalian, were following the efforts to overturn the 2020 presidential election).   In rendering its verdict, the Court observed the connection between Badalian's calls for violence and his awareness of the certification process, finding:

> What we have is a defendant who was extremely well aware of what was going on politically and procedurally after the election, and who was following the various state procedures and legal challenges closely.   He knew exactly what was supposed to happen on January 6 and he wasn't having any of it.   He planned, he tried to organize others, and he went to Washington with a clear intent, the single-minded purpose to keep the transfer of power from taking place.

Verdict at 3; *see also* Verdict at 6 ("Badalian knew it was all about the Electoral college all along."); Exhibits 902.03; 902.19; 902.01; 903.06; 903.08; 903.10; 903.18; 903.20; 903.27; 905.09; 904.18; 904.19; 904.31; 904.52.

As the group discussed their scheme, Badalian at times took efforts to obscure his revolutionary intent in real time.   On December 6, 2020, he wrote "we cant plot anyones demise," but, he continued, "the way is to train and train and one day when were all together in training, the decision has to be made and executed spontaneously as to whom we arrest."   Exhibit 906.21. Consistent with his goal of military action, training for violence was a frequent focus in Badalian's scheme.   Even before the 2020 election took place, on October 27, 2020, Badalian was calling for his group to train.   "we should definitely go shooting this week.   shit might really go down after the election."   Exhibit 907.03.

After the election, he continued to call on his team to train.   On November 23, 2020, he wrote, "i really do think we need a dedicated 8 or 10 man squad with practiced manuevers and formations and going to paintball this sunday could be a great way to practice such things." Exhibit 902.13.   On November 29, 2020, he continued to push his training agenda: "[A]nother drunken late night wont lead to a day of solid training for the coming unrest.   Weve been slipping. Its way scarier for the powers that be if they see Patriots are amassing for training rather than just rallying."   Exhibit 902.18.   He continued his calls to train after the group made its plans to travel to Washington, D.C. for the January 6, 2021 proceeding in Congress.   "Paintball.   one last group training before DC."   Exhibit 904.21.   He continued, "We need to know how to fight together while under fire."   *Id*.   When another group member asked, "what are you training for exactly?" Badalian didn't hesitate: "a firefight with armed terrorists."   *Id.*

Badalian's focus on paintball as training for combat was a frequent fixture of the Telegram group.   *See* Exhibits 906.02 ("[W]e gotta train our minds to listen for another in the heat of battle

and coordinate and call out enemy positions and manuevers in real time and then execute them. all while being shot at."); 906.22 ("all our recreation should pertain to this war"; "whats more fun than training for war, actually?   nothing really."); 903.03 ("Paintballing is the most fun way to train as a group"; "its full contact chess"); 903.09 ("were gonna be that much sharper and more organized in a firefight now"); 904.22 ("Paintball is training because it is extensive physical exertion, group coordination and communication, hand eye target coordination, shooting while moving on a moving target, using cover vs concealment, setting ambushes, taking the flank."). For millions of Americans, paintball is a harmless form of entertainment and recreation.   But that's not how Badalian saw it.   As the Court found in its verdict, "He had some grandiose ideas about his importance in the scheme of things.   And back then in, real time -- as opposed to for my consumption at trial -- he was actively encouraging the others to show up for training purposes. So it really doesn't matter to the analysis that it was all incredibly immature and incredibly ineffective."   Verdict at 12.

### The Crystallizing Moment: Trump's Tweet on December 19, 2020

Badalian's violent rhetoric and rallying cries crystallized on December 19, 2020, when a time and place for Badalian's planned revolution presented itself in the form of a Tweet from the former president: "Statistically impossible to have lost the 2020 Election. Big protest in D.C. on January 6th.   Be there, will be wild!"   Another member of the chat sent the Tweet to the group, sparking Badalian and his group into action.   Exhibit 903.30.

As the Court recognized, this Tweet galvanized Badalian and his efforts to recruit members of the Patriots[45]MAGA Gang to come to Washington, D.C., armed and ready.   *See* Verdict at 10

("This gives the group the focus needs it tells them where to be and when.   And no one needs to tell Edward Badalian what January 6 is.   The group notices this immediately.").   On December 21, 2020, Badalian shared what the Court called his "manifesto," Verdict at 13, "we need to violently remove traitors and if they are in key positions rapidly replace them with able bodied Patriots."   Exhibit 904.03.



*Exhibit 904.03*

In the days that followed, Badalian and Rodriguez worked together to rally their cohort to travel to Washington, D.C.   On December 21, 2020, Rodriguez wrote, "Trump is calling on us," adding, "We must put our differences aside and fight."   Exhibit 904.08.   Badalian added to the effort the next day: "our duly elected leader has called his marching orders.   we gotta show up on

7

the 5th." Exhibit 904.17. When another member of the group expressed doubt about then-President Trump's reinauguration, and wrote, "We shall see," Badalian immediately replied, "nah. We shall act." Exhibit 904.11.

As he prepared for January 6, 2021, Badalian continued to closely follow the efforts to overturn the election results. On December 22, 2020, regarding a possible invocation of the Insurrection Act, Badalian wrote, "he has to let it sit on his desk until Jan 3. veto. By the time mitch can do the override we will be there. Then he can invoke and Patriots will be at the ready." Exhibit 904.32. On January 2, 2021, Badalian joined others in the group in wondering whether then-Vice President Mike Pence would "betray" then-President Trump. One member of the group asked, "Is pence going to betray Trump? Is he the Judas we talked about before?" Exhibit 905.10. Badalian responded, "or brutus." *Id.*

Still engaged in the delusion that he was entitled to mete out his own vigilante justice, Badalian reiterated his manifesto on January 2, 2021: "real Trump supporters are looking to arrest traitors like Nancy and Mitch and Biden etc. not attack buildings lol." Exhibit 905.15. Badalian added, "and it is about arresting them no shooting traitors either. if they resist arrest thats different." Exhibit 905.16.

 Badalian's planning with the group went beyond mere rhetoric. He collected weapons and tactical gear. *See* Trial Tr. 839:2–840:12 (Badalian testifying about the weapons he was willing to, and did, bring to Washington, D.C. for others from the group chat.); Trial Tr. 143:18–144:13 (Almonte describing logistics planning in the group chat, including planning to bring weapons to Washington, D.C.); *see also* Exhibits 905.16; 904.35; 904.55; 905.04; 905.07. In fact,

Badalian even brought a pistol to Washington, D.C.   Trial Tr. 839:22–24.   He coordinated the rental of a vehicle for the group, *see* Exhibits 904.46; 536; 537, and directed their plan to join an organized caravan called "MAGA Cavalry," *see* Exhibits 904.58 & 904.59.   While driving to Washington, D.C., Badalian was still communicating with the group through Telegram and reiterating their mission: "we dont want to fight antifa lol we want to arrest traitors."   Exhibit 905.32.

On the evening of January 5, 2021, Badalian, Rodriguez, and others gathered at their Airbnb in Arlington, VA.   Once news of the results of the special elections for the U.S. Senate seats in Georgia came in, Badalian and Rodriguez each texted their group their final messages of the day, reiterating their calls for violence.   Badalian wrote, "the senators should be out here with us fighting not sitting on their asses expecting things to go back to normal."   Exhibit 905.40. Rodriguez added, "There will be blood.   Welcome to the revolution."   *Id.*

### January 6, 2021: The Attack on the U.S. Capitol Building

On the morning of January 6, 2021, Badalian and his group attended the Stop the Steal rally on the National Mall.   Badalian became frustrated waiting in the line to go through security and said, "we need to jump these barricades and just storm it all in numbers."   Trial Tr. 135:3– 136:10.   At the National Mall, Badalian talked about "revolution combat" and "1776."   Trial Tr. 154:6–154:14.   Badalian was present for and listened to speeches by then-President Trump and others.   *See* Trial Tr. 844:21–845:9, 846:5–21.



*Exhibit 504*

After listening to then-President Trump's speech, Badalian walked straight to the U.S. Capitol building.   After illegally traversing the West Front of the Capitol grounds, Badalian made his way toward a northwest set of stairs leading to the Upper West Terrace.   *See* Exhibit 319.1.



*Exhibit 319.1*

<u>Rodriguez at the Lower West Terrace Tunnel</u>

At some point, as they approached the U.S. Capitol building, Badalian and Rodriguez separated. As the Court is well aware from Rodriguez's own sentencing, Rodriguez made his way to the Lower West Terrace tunnel at approximately 2:46 PM, where he joined other rioters in battling law enforcement officers trying to protect the Capitol building—and the government leaders inside—from the violent mob. After battling with officers at the entrance to the U.S. Capitol, Rodriguez and other rioters were expelled from the tunnel. On the Lower West Terrace Inaugural Platform steps, at approximately 3:19 PM, Rodriguez repeatedly tazed MPD Officer Michael Fanone. *See, e.g.*, Exhibit 304; Exhibit 204 (15:19:10–15:19:44). Rodriguez's additional conduct on the Lower West Terrace is discussed in detail in the United States' sentencing memorandum filed in his case, *see* ECF No. 189, and, for efficiency will not be repeated

at length here.

<u>Badalian on the Lower West Terrace</u>

Badalian joined rioters on the Lower West Terrace cheering on rioters engaged in a "heave ho" effort to push past the police protecting the U.S. Capitol in the Lower West Terrace Tunnel. *See* Exhibit 318 (1:20–2:00).



*Exhibit 318 (1:23)*

While on the Lower West Terrace, Badalian observed a rioter trying to break a window outside office suite ST-2M of the Capitol building and pulled the rioter away from the window. *See* Exhibits 422 & 438.   Badalian made clear that that damaging the building was a distraction from his ultimate goal, which he had been expressing since November 4, 2020, to arrest people he viewed as traitors: "We wanna arrest traitors.   We don't wanna damage the building."   Exhibit 438 (0:39–0:42).



*Exhibit 422 (0:02)*

Badalian then ascended up to the scaffolding overlooking the Upper West Terrace on the northwest side of the building.   Once there, he tried to direct the crowd to the entrances on the Upper West Terrace.   *See* Exhibit 323 (10:57–11:01).   When he saw rioters engaged in confrontations with law enforcement, Badalian turned and flipped off the police.   *See id.* (12:06–12:30).



*Exhibit 323 (10:59)*



*Exhibit 323 (12:30)*

<u>Badalian Inside the U.S. Capitol Building</u>

Badalian returned to the Lower West Terrace, to the area near the tunnel.   By this time,
rioters had succeeded in breaking through the ST-2M window and rioters had entered the room.
After being called by his friend Gina Bisignano, *see* Exhibit 306 (1:16–1:21), Badalian climbed
through the broken window—the same broken window Badalian has often bragged about valiantly
defending—and entered the U.S. Capitol.



*Exhibit 323 (24:09)*

Once inside, Badalian stood side by side with other rioters, including Rodriguez, as they
ransacked offices and broke down doors.   *See* Exhibits 305 (1:35–8:14) & 306.   As he walked
from room to room, he saw chairs flipped over, tables broken, doors ripped off their hinges, and
property being stolen.   *See* Exhibit 305.   He walked by, unconcerned, as Rodriguez smashed
another window.   *See id.* (7:00–7:05; 7:55–8:14).

15



*Exhibit 305 (4:15)*



*Exhibit 305 (7:03)*

Badalian left the building only when forced to by law enforcement.   *See* Exhibits 436 (00:17) &

323 (31:50).



*Exhibit 323 (31:50)*

### *Badalian's Attempts To Cover Up His Conduct*

Though proud of his actions, Badalian was anxious to hide the evidence of his crimes. Indeed, Badalian's efforts to cover up his conduct began before the crime was even complete. Badalian was frequently trying to cover his tracks, in real time, on Telegram.   As the group planned their trip to Washington, D.C., Badalian made it clear he wanted a "minimum paper trail." Exhibit 904.54.

After January 6, 2021, members of the Patriots[45]MAGA Gang Telegram group discussed the criminal investigation into the riot.   *See, e.g.*, Exhibit 905 (23:06).   While driving back to California from Washington, D.C., in an effort to rewrite history and assume the mantle of January 6th hero, Badalian took to InfoWars under an assumed name to claim he had been protecting the

building from rioters.   *See* Exhibit 303 (0:00–4:21).   Of course, Badalian never mentioned in this

interview that he later climbed through that same broken window, along with his coconspirator.

*See id.*   But even in that interview, Badalian revealed his true purpose: "We're here for the

traitors."   *Id.* (2:21–2:41).

In that interview, the host referred to Badalian by a code name: Turbo.   That's the code

name Badalian told Gina Bisignano, who had arranged the InfoWars interview, to use for him,

rather than his real name.   But Bisignano made a mistake, and referred to Badalian, in that

interview, as "Ed."   *See* Exhibit 303 (4:22–5:14).

Because of Bisignano's mistake, Badalian, Rodriguez, and their third codefendant—Paul

Belosic—went to Bisignano's home on their way home from Washington, D.C.   *See* Trial Tr.

345:16–346:11; *id.* 347:8–21; 348:3–20; 349:14–25; 357:24–358:15; 388:22–389:5.   *But cf.* Trial

Tr. 383:15–384:5 (Bisignano testifying on cross-examination that it was "possible" this trip

included only Belosic and Rodriguez, but reiterating, "I do recall seeing Ed at my table, but it

could have been at another time.   I distinctly remember them at my table.   Now, I could be wrong,

but I do remember that.").   Here, the three men joined together to continue the cover up and to

seek to persuade Bisignano to destroy her video and photographic evidence of the three men at the

Capitol.   Bisignano testified that the three men entered her home and, because they were afraid

their words would be overheard, Belosic unplugged her Alexa devices.   Still silent, Belosic wrote,

"I want to help you delete everything and transfer the files to a secure hard drive," Exhibit 521.

Trial Tr. 351:15–356:2.



*Exhibit 521*

The Court questioned Bisignano's testimony regarding this incident—and ultimately, given its questions regarding Bisignano's testimony, acquitted Badalian of Count Three, which stemmed from this conduct.  *See* Verdict at 41–42.  In rendering its verdict, the Court nevertheless found:

> For purposes of Rule 29 . . . the evidence was sufficient such that a reasonable juror, resolving all inferences in the government's favor, could reach a determination that the defendant was guilty of this offense.  Gina Bisignano did say initially on direct that after she spoke on InfoWars and named defendant as 'Ed,' that 'everybody was a little mad at me, although Ed didn't get nasty.'  She did recall a conversation where he was in her kitchen.  This version made sense, since she specifically recalled that they came on their way home from D.C., when they would still have been together in the van.  And not only in the grand jury, but in court, she had a distinct recollection of the defendant sitting in her kitchen and being part of the incident involving DJ and Jeff.

19

Verdict at 40.   As the Court noted, Bisignano's testimony that Badalian was present for this incident is consistent with her previous grand jury testimony on the matter.   Exhibit 1102 ("Q: And previously when we've talked about this, I think you've mentioned that all three of them did want you to delete what you have; is that accurate?   A: From what I recall, yes.   They were warning me not to talk to people.").   Bisignano agreed that her memory was more fresh at the time of her grand jury testimony—August 2021.   *See* Trial Tr. 358:17–359:4.

In their Telegram group, Badalian and Rodriguez continued their efforts to cover up their crimes.   While Rodriguez told the group to post "[n]o incriminating stuff" on Telegram, Exhibit 604.05, Badalian's efforts were, in a sense, subtler: he just started lying about what they did.   He wrote, "2 choices guys.   either you stop acting like we are criminals or im deleting the group.   we didn't do anything wrong.   simply being on capitol grounds isnt illegal[.]   we didnt break anything or hurt anyone."   Exhibit 604.07.   Of course, Badalian knew this was a lie when he said it.   He knew that he stood by as rioters broke down doors right in front of him.   *See* Exhibit 306 (3:55–4:38).   He had received Rodriguez's Telegram message bragging about his assault on Officer Fanone with a taser, that he "did so much fucking shit" and "tazzzzed the fuck out of the blue."   Exhibit 905.50.   Badalian even testified at trial that, on the drive back to Los Angeles, Rodriguez "told [him] that [Rodriguez] tased police officers in the knuckles and were able to secure their riot shields."   Trial Tr. 768:1–13; *cf.* Trial Tr. 768:13–15.

As part of his efforts to cover up his crimes, Badalian got a new phone and a new telephone number "[a]bout a month after" returning from Washington, D.C.   Trial Tr. 810:17–20; *see also* Trial Tr. 696:4–17.   In addition to changing his phone—and his phone number, an unnecessary

step when innocently changing phones—Badalian directed his girlfriend not to even save his new number with his name on her phone.  *See* Trial Tr. 697:11–698:24.

### *Badalian's Embraces His Conduct*

After January 6, 2021, though trying to avoid criminal responsibility, Badalian was proud of what he had done.   On January 15, 2021, he shared in the PATRIOTS[45]MAGA Gang Telegram group a Tweet from then-President Trump, which attempted to justify and legitimize the riot: "These are the things and events that happen when a sacred landslide election victory is so unceremoniously & viciously stripped away from great patriots who have been badly and unfairly treated for so long.   Go home with love & in peace.   Remember this day forever!"  Exhibit 908 (10:42).  Badalian added, "that's how our man really felt about what happened."  *Id.*  Even as recently as his trial, Badalian found the attack at the U.S. Capitol not just commendable, but funny. On January 8, 2021, he shared in the Telegram group an image of a fake Lego set depicting rioting inside the U.S. Capitol building.   Exhibit 905 (26:09).   At trial, when shown the image again, Badalian couldn't help himself from laughing, saying it is "kind of a funny meme."   Trial Tr. 913:8–15.

## II.     THE CHARGES AND VERDICT

On November 17, 2021, a federal grand jury returned a superseding indictment charging Badalian with four counts, including Count One (Conspiracy, in violation of 18 U.S.C. § 371); Count Two (Obstruction of an Official Proceeding, Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2); Count Three (Tampering with Documents or Proceedings, in violation of 18 U.S.C. § 1512(c)(1)); and Count Ten (Entering and Remaining in a Restricted Building and

Grounds, in violation of 18 U.S.C. § 1752(a)(1)).   On April 4, 2023, Badalian was convicted of Counts One, Two, and Ten following a bench trial.   Minute Entry of April 4, 2023; ECF No. 175 (hereinafter "Verdict").   The Court found Badalian not guilty on Count Three.   *See* Verdict.

## III.   STATUTORY PENALTIES

Badalian now faces sentencing on Conspiracy, in violation of 18 U.S.C. § 371; Obstruction of an Official Proceeding, Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2), 2; and Entering and Remaining in a Restricted Building and Grounds, in violation of 18 U.S.C. § 1752(a)(1).

As noted by the Presentence Report issued by the U.S. Probation Office, PSR at ¶¶ 90–92, 96–97 & 114, Badalian faces a maximum sentence of 5 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for Count One; a maximum sentence of 20 years' imprisonment, 3 years' supervised release, and a fine of $250,000 for Count Two; and a maximum sentence of 1 year's imprisonment, 1 year's supervised release, and a fine of $100,000 for Count Ten.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.  Guidelines Calculations

The United States submits that the calculation laid out in the PSR is correct.   PSR at ¶ 36–53.   That calculation is as follows:

**Count One: 18 U.S.C. § 371:**

| U.S.S.G. § 2X1.1(a) | Conspiracy Base Offense Level (Adjusted) | **31** |
| | | **(See Below)** |
| | Total | **31** |

**Count Two: 18 U.S.C. § 1512(c)(2), § 2**[2]

| U.S.S.G. §§ 2J1.2(a), 2X2.1 | Obstruction Base Offense Level | **14** |
| U.S.S.G. § 2J1.2(b)(1)(B) | Cause/Threat Injury or Damage | **+8** |
| U.S.S.G. § 2J1.2(b)(2) | Substantial Interference with Justice | **+3** |
| U.S.S.G. § 2J1.2(b)(3) | Extensive Scope, Planning, or Preparation | **+2** |
| U.S.S.G. § 3B1.1(c) | Aggravating Role | **+2** |
| U.S.S.G. § 3C1.1 | Obstruction of Justice | **+2** |
| | Total | **31** |

**Count Ten: 18 U.S.C. § 1752(a)(1)**[3]

| U.S.S.G. § 2B2.3(a) | Trespass Base Offense Level | **4** |
| U.S.S.G. § 2B2.3(b)(1)(A)(vii) | Restricted Building or Grounds | **+2** |
| U.S.S.G. § 2B2.3(c)(1) | To Commit A Felony Cross-Reference | **31** |
| | | **(See Above)** |
| | Total | **31** |

## B. The Enhancement for Causing or Threatening To Cause Physical Injury to a Person or Property Damage Applies

United States Sentencing Guidelines ("Guidelines") § 2J1.2 provides for an eight-level increase if the offense involved causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice." U.S.S.G. § 2J1.2(b)(1)(B). As the Guidelines make clear, specific offense characteristic enhancements shall be applied on the basis of "all acts

---

[2] The PSR notes that "[t]he overt acts within Count One are Obstruction of an Official Proceeding, in violation of 18 U.S.C. § 1512(c)(2) [Count One-A] and Tampering with Documents or Proceedings, in violation of 18 U.S.C. § 1512(c)(1) [Count One-B]." PSR at ¶ 38. Because Badalian was acquitted of Count Three—under § 1512(c)(1)—the Guidelines for Count One should be driven by the § 1512(c)(2) Guidelines. This clarification does not affect the PSR's calculation of the Guidelines.

[3] The PSR notes Count Ten is for a violation of 18 U.S.C. §§ 1752(a)(1) and (b)(1)(A). PSR at ¶ 35. Elsewhere, the PSR correctly clarifies that the (b)(1)(A) enhancement "does not apply to defendant Badalian." PSR at ¶ 5 n.4.

and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant" and "all harm that resulted from th[os]e acts and omissions . . . and all harm that was the object of such acts and omissions."   U.S.S.G. § 1.3(a)(1)(A) & (a)(3). Likewise, these enhancements shall also apply, in a conspiracy case, such as this one, on the basis of "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity," and "all harm that resulted from th[os]e acts and omissions . . . and all harm that was the object of such acts and omissions."   U.S.S.G. § 1.3(a)(1)(B) & (a)(3).   Among the other enhancements above, the United States submits that the eight-point enhancement for causing or threatening injury to a person or damage to property "in order to obstruct the administration of justice" should be applied here.

As an initial matter, Badalian's own statements make clear his violent threats in connection with these crimes.   The Court recognized as Badalian's "manifesto" his statement, "We need to violently remove traitors and if they are in key positions rapidly replace them with able bodied Patriots."   Exhibit 904.03; Verdict at 13.   Despite Badalian's attempt to obscure these statements at trial, these are violent threats—violent threats that were directed at members of Congress January 6, 2021.   That "the traitors and tyrants never presented themselves," Verdict at 3, for Badalian to execute his violent aims does not eliminate that threat.   They were in hiding—from rioters like him.   The threat of physical violence is at the heart of Badalian's crime.   The Court need look no further than Badalian's own words to apply this enhancement.

The Court can also readily apply the enhancement on the basis of Rodriguez's assault of

Office Fanone or his destruction of property inside the Capitol building.   In working with Rodriguez, Badalian chose his coconspirator carefully: he chose someone equally eager for violent revolution and willing to train.   As the Court noted, after weeks of messages from Rodriguez calling for "war and revolution," "there's no evidence that the defendant ever urged him to tone it down or took issue with any of it."   Verdict at 4.   As they trained, as they amassed weapons, and as they talked about the need for revolution, violence against law enforcement protecting the building was not just foreseeable and within the scope of their scheme, but it was a part of their scheme all along.   On the evening of January 5, Rodriguez wrote to their Telegram group, "There will be blood.   Welcome to the revolution."   Exhibit 905.40.   Badalian didn't recoil.   Instead, he set an alarm and set off for their planned revolution together on the morning of January 6.   That day, when Rodriguez announced to their Telegram group on January 6, "did so much fucking shit" and "tazzzzed the fuck out of the blue," Exhibit 905.50, Badalian, again, was not surprised by this level of violence and did not back away or call out Rodriguez.   Instead, they celebrated at night and drove back to California together the next day.

In his sentencing memorandum, Badalian calls it "unfortunate" that his coconspirator tased a police officer.   ECF No. 214 at 2.   But, he protests, the Court should ignore that because "[t]he two of them are not seen on camera communicating with each other during Mr. Rodriguez's misdeeds."   *Id.* at 9.   But the defendant is manufacturing an artificially high bar for coconspirator liability.   Coconspirator liability does not require that the two men jointly held the taser with laced fingers, locked eyed, and then depressed the button together.   All that is required is that the act be foreseeable, in furtherance of their scheme, and part of their jointly undertaken activity.   U.S.S.G.

§ 1.3(a)(1)(B) & (a)(3).   Rodriguez's assault easily satisfies all three requirements.   Rodriguez knew as much, which is why he took the earliest opportunity he could to turn back to his Telegram group and brag about his accomplishment—"tazzzzed the fuck out of the blue"—while still on Capitol grounds.   Exhibit 905.50.   Indeed, this case highlights why coconspirator liability is so important.   Badalian knew who he was working with.   Having conspired with a man like Rodriguez—who told Badalian "Ed but we'd murder them.   We'd go wild like Billy the Kid fighting corruption," Exhibit 902.05, and who promised on January 5, "[t]here will be blood," Exhibit 905.40—Badalian cannot then express his shock and dismay when Rodriguez delivers on his violent promises.

But the Court need not rely solely on Rodriguez's conduct to apply this enhancement. Badalian's aiding and abetting of violent and destructive rioters went further than just his scheme with Rodriguez.   Badalian was on Capitol grounds for hours, cheering on rioters engaged in the heave-ho efforts against law enforcement, and entering Capitol offices as his rioter friends ransacked them.   As the Court found, "The defendant not only stood by, but actively encouraged as others assaulted officers, broke into and destroyed items in the Capitol building."   Verdict at 37.[4]

In planning his obstructive conduct, Badalian personally threatened violence.   He supported Rodriguez and other rioters engaged in violence and destruction.   Accordingly, the Court should apply the enhancement.

---

[4] In a continued effort to minimize his conduct, Badalian's sentencing memorandum calls his choice to break into the Capitol with his friends, a "4-minute misadventure."   ECF No. 214 at 6.

### C.  Criminal History Category

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.  PSR at ¶ 56.  Accordingly, based on the government's calculation of the defendant's total adjusted offense level, at 31, Badalian's advisory Guidelines imprisonment range is 108 to 135 months' imprisonment.

### D.  Application of 3A1.4 n.4 Upward Departure

As the Court knows, the United States sought a three-level upward departure, pursuant to U.S.S.G. § 3A1.4 application note 4 ("Note 4"), against Badalian's coconspirator, Rodriguez.  *See* ECF No. 189.  The Court declined to grant the requested upward departure, but imposed an above-Guideline sentence for Rodriguez, pursuant to the Court's analysis under 18 U.S.C. § 3553(a). For the reasons stated in its sentencing memorandum regarding Rodriguez, the United States submits that an upward departure under Note 4 would be appropriate in this case as well, because Badalian's conduct was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct."  U.S.S.G. § 3A1.4, app. note 4.  However, in recognition of the Court's prior ruling in Rodriguez's case, and because, in light of the Section 3553(a) factors, the United States submits that a midrange sentence of 121 months' imprisonment is appropriate, the United States will not request an upward departure here.

### V.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).  As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

**A.      Nature and Circumstances of the Offense**

As shown in Section I of this memorandum, Badalian's felonious conduct on January 6,
2021 was part of a massive riot that almost succeeded in preventing the certification vote from
being carried out, frustrating the peaceful transition of presidential power, and throwing the United
States into a Constitutional crisis.   Badalian planned with others for weeks to obstruct the official
proceeding, including through the threatened and actual use of force, as described above.   The
nature and circumstances of Badalian's offenses were of the utmost seriousness, and fully support
the government's recommended sentence of 121 months.

**B.      The History and Characteristics of the Defendant**

The Court had the opportunity to get to know Badalian during his testimony at trial.   As
the Court recognized in rendering its verdict, Badalian, "appears to be a very self-satisfied young
man, impressed with his own intelligence and strategic acumen."   Verdict at 35.   At trial, these
characteristics were on full display.

Badalian's testimony at trial was routinely incredible.   An image shared over Badalian's
Telegram group established a plan for the group to be at the Capitol building at 1 PM on January
6.   *See* Exhibit 905.19.   Nevertheless, Badalian claimed that he never discussed going to the
Capitol on January 6.   *See* Trial Tr. 846:25–24.   The Court rightly rejected the incredible claim:
"[E]ven if his plans didn't coalesce until he heard the former President speak—which I don't
believe—Mr. Trump did not call upon the crowd to make a loop around the city.   The speakers
encouraged the crowd to fight."   Verdict at 37.

When confronted with video showing him joining in the heave-ho effort to assault police,

28

*see* Exhibit 318 (1:20–2:00), Badalian testified he knew that "the crowd was pushing back against the officers," Trial Tr. 867:25, but he explained that the heave-ho chant was far "too catchy" to not join in.   Trial Tr. 753: 9–13; 868:11–14.   Badalian also bizarrely claimed that the heave ho was "a de-escalation tactic."   Trial Tr. 868:7–10; *see also* Trial Tr. 864:11–12 (Badalian testifying the heave ho was not "violent").   The Court rejected this story too: "Nothing about what was going on at that point was a deescalation.   The rioters were still actively trying to overcome the police and get in.   You can see weapons being passed to the rioters, things still being thrown.   So the defendant watches that, he does nothing, he cheers along, he approves."   Verdict at 18.   When asked about giving the heave hoers a thumbs up, Badalian explained, "Yeah, as in go away from the tunnel."   Trial Tr. 865:25–866:1.

When Badalian was shown a video of himself flipping off the police when they were engaged in a confrontation with a rioter, *see* Exhibit 323 (12:06–12:30), the Court observed Badalian squirm and change his story in real time.   First, Badalian explained, "I think that's my index finger, actually."   Trial Tr. 886:6.   Then, he decided he was actually gesturing to the rioters: "I don't think I was doing that to the police; it might have been to the rioters or whoever was standing there.   I don't think that's actually at the police there because, like I said, the perspective is different than what you can see from this video.   It makes it seem like I'm among the police, when I'm actually really far from them here."   Trial Tr. 886:9–14.   The Court rejected this lie as well.   "Mr. Back the Blue watches officers scuffle with a rioter, and who does he tell off?   The officers.   He gives the officers the finger."   Verdict at 20.

Badalian also told the Court that he only entered the building because "antifa was inside"

and there was "CS gas" he was trying to escape.   Trial Tr. 871:5–17; *see also* 869:11–19; 870:13–21.   The Court rejected Badalian's post hoc justifications: "I agree with the government that the evidence showed, by the close of the government's case, that the defendant went in because he wanted to."   Verdict at 21.

When confronted with his efforts to cover up his conduct, Badalian testified at trial that he changed phones because "antifa was trying to dox me."   Trial Tr. 810:24–811:2.   The Court rejected that incredible explanation in its verdict: "I don't buy the I-was-afraid-of-being-doxxed theory, which I find was crafted for this trial. . . .   After January 6, he was trying to protect himself from someone else; the FBI.   And he knew full well he wasn't supposed to have been inside."   Verdict at 24–25.

Further examples of Badalian's lies and incredible testimony at trial are legion:

- Badalian claimed he did not know who he thought was guilty of treason when he talked about traitors and treason in his Telegram messages.   Trial Tr. 813:7–814:1.   But Badalian's own words make clear he had a specific list of targets he believed were guilty of treason, including members of Congress and Joe Biden, *see* Exhibit 901.23, Trial Tr. 814:2–815:12.

- Badalian claimed that his calls to "arrest" and "violently remove" the people he viewed as traitors meant only that the police should execute those arrests.   *See* Trial Tr. 816:7–18; Trial Tr. 818:5–10.   But Badalian's statements in Telegram messages and at the Capitol were clear that he was calling for vigilante justice.   *See* Trial Tr. 817:18–818:3; 822:12–823:18.

- Badalian repeatedly testified that he "was going [to Washington, D.C. for January 6] to fight antifa."   Trial Tr. 831:1–14.   But while driving to Washington, D.C., Badalian had told his group his true goal: "we dont want to fight antifa lol we want to arrest traitors." Exhibit 905.32.

- Badalian tried to claim in his testimony that he did not train for January 6, because "I don't agree with the characterization of paintball as training."   Trial Tr. 836:7–14.   But Badalian repeatedly called explicitly for "training" through paintball as he prepared for January 6.   *See* Exhibits 904.21; 902.13; 902.18; 906.02; 903.03; 903.09; 904.22. Badalian likewise testified that he "wouldn't characterize it as [training for] war."   Trial Tr. 837:14–15.   But in his Telegram messages, Badalian did exactly that, writing "all our recreation should pertain to this war" and "whats more fun than training for war, actually? nothing really."   Exhibit 906.22.

- Badalian was asked why he wanted to replace traitors with "*able-bodied*" patriots: "Why was it important to you that these people that you wanted to replace the traitors be able-bodied?"   Trial Tr. 817:8–9; *see also* Exhibit 904.03.   Badalian fumbled to come up with an explanation, beyond the obvious one: "Um -- so they don't – they'll be able to run the country, unlike Joe Biden and John Fetterman."   Trial Tr. 817:10–11.

- Badalian claimed that, when he was on Capitol grounds, he assumed the rioters were all trying to engage in a peaceful "march around the city to protest."   Trial Tr. 857:13–14; *see, e.g.*, Trial Tr. 853:9–19; 857:7–858:1; 869:11–870:1.   As the Court noted in its verdict, "[t]he idea that he ended up pushing his way through the crowd, pushing his

31

way up the building, climbing up a concrete banister to stand in a tight line with others was because he was trying to get around the building to the other side made no sense whatsoever."   Verdict at 37.

•      Badalian claimed that videos showing him waving the crowd to the Upper West Terrace were evidence of him "try[ing] to disperse the crowd."   869:2–10.

•      Badalian testified that, while inside the Capitol building, he spent his time "look[ing] for a way out."   Trial Tr. 876:2–6; *see also* Trial Tr. 888:19–20.   Rather than turning around and exiting through the same broken window he came in through, Badalian testified this required him to go from office to office within the Capitol, all while passing a door with an "Exit" sign.   *See* Trial Tr. 876:2–6; Trial Tr. 891:11–894:2.

•      Badalian testified that if he knew Rodriguez had assaulted law enforcement, he would not "have traveled back with him" and "would have reported it."   Trial Tr. 901:5–14.   But Badalian did drive back to California with Rodriguez, and never reported Rodriguez, even though Rodriguez told him he had tazed multiple officers.   "I didn't believe him," Badalian claimed.   Trial Tr. 901:15–19.

In addition to Badalian's lies during his testimony, the Court learned that Badalian spent at least some of his time during trial texting a former paramour about the anticipated testimony of Gina Bisignano, a witness Badalian knew was going to be called by the United States.   *See* Trial Tr. 908:11–911:6.   That former girlfriend was simultaneously reaching out to Bisignano and harassing her in advance of her testimony.   *See* Trial Tr. 300:24–304:17; *see also* Verdict at 42 (noting that Badalian's communications with this individual about Bisignano, during trial, "is not

a fact, by the way, that helps the defendant").

But the defendant's "self satisfaction" and "hubris" were not just displayed at trial; as the Court noted, his conduct at trial was "of a piece with the hubris he showed all along; that he had the right to come to the nation's Capitol and arrest people.   To make sure the Electoral process did not come to its conclusion.   To be part of the havoc of the day and then blame it on everyone else."   Verdict at 36.   It is further consistent with Badalian's conduct and complete lack of remorse following the verdict, which is discussed below regarding the need for specific deterrence.[5]

This defendant epitomizes disrespect for the law.   A lengthy sentence is warranted ensure that he understands he has committed serious crimes that come with consequences, in order to deter conduct like this again in the future.

### C.    The Need for the Sentence Imposed To Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a lengthy sentence of incarceration.   Badalian's crime was an attack on not just the Capitol, but the United States and its system of government.   He joined a mob and struck a blow to a central feature of the American system: the peaceful transfer of power.   As the Court noted, "He knew exactly what was supposed to happen on January 6 and he wasn't having any of it.   He planned, he tried to organize others, and he went to Washington with a clear intent, the single-minded purpose to keep the transfer of

---

[5] Following trial, the defendant has extended his lack of respect for the Court and the law to a lack of respect for probation.   The defendant's Presentence Report references basic information the defendant was unwilling to provide to probation, regarding his educational and employment history.    PSR at ¶¶ 77–82.

power from taking place."   Verdict at 3.   This is a defendant who rallied others to the cause of "violently remov[ing]" and "arrest[ing]" political leaders who he decides are traitors, and took that message to the U.S. Capitol building, where he joined others in invading the building.   He has never expressed remorse or walked away from those calls for violence.   Instead, he has publicly cast himself in the role of hero, tried to have evidence destroyed, and provided false testimony to the Court.   A lengthy term of incarceration is necessary to reflect the seriousness of his crime and to promote respect for the law.

### D.   The Need for the Sentence To Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others.   18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol and the defendant's conduct in particular certainly was.[6]   The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Badalian has never taken responsibility or expressed regret for his conduct on January 6, 2021.   In the days following January 6, the defendant tried to assume the mantle of hero in the public narrative and privately expressed his glee about the invasion of the Capitol.   He has not

---

[6] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

wavered since.   In fact, upon receiving the verdict in this case, Badalian posed for cameras, giving

a thumbs up, showing off his new ankle monitor, and arguing that he has the lawful authority to

arrest politicians he disagrees with.



Exhibit 1401.   In rendering its verdict, the Court explained, "And no, Mr. Badalian, the

Constitution does not give you the right" to "effect an utterly unlawful citizen's arrest of Nancy

Pelosi."   Verdict at 34.   The Court should be extremely skeptical of any efforts by Badalian, now

that he is facing sentencing, to proclaim a change of heart, given his statements on the day of the

verdict.   When a reporter asked Badalian, "What did you make of [the Court's] comments about,

I guess, this idea that you don't have the right to arrest Nancy Pelosi?"   Badalian responded, "Right, so I thought the idea that citizens don't have the right to arrest the politicians, I don't think that's actually true.   I think they would have the right to—any person has the right to arrest anyone if they see them committing a crime or if they have knowledge of them committing a crime." Exhibit 1402 (0:00 to 0:22).   When asked what he would be arresting Nancy Pelosi for, Badalian responded, "suspicion of knowing" about "election interference."   Exhibit 1403 (1:10 to 1:19).

In another interview following the verdict, Badalian continued to shirk responsibility and masquerade as a January 6 hero.   *See* Exhibit 1404.   He complained of his one day in jail following his arrest, *see id.* (0:32–0:40: "You can get that satisfaction there, Democrats, that I was chained up in a way that would satisfy you psychopaths.").   He offered a new theory that the rioter he "disarmed" was among a group of "agent provocateurs."   *Id.* (1:05–1:35.).   He chuckled when he mentioned Rodriguez's assault on MPD Officer Fanone.   *Id.* (2:37–2:49).   He expressed the belief that most people think his involvement in January 6 was "pretty cool."   *Id.* (4:37–5:40). The defendant has a First Amendment right and can speak his mind freely.   But in considering the need for specific deterrence, the Court should consider the defendant's utter lack of remorse and continued desire to "go for some glory," Verdict at 19, as he continues to rewrite history regarding his own conduct on January 6.

In his sentencing memorandum, Badalian's continued efforts to minimize his conduct were on full display.   The defendant claims his only "crime was his entry into the Capitol building," as if Badalian were guilty of only a misdemeanor offense.   ECF No. 214 at 9.   He assumes the role of not just hero, but victim, as he laments that he has been punished enough already, "by virtue of

having his name smeared across the internet."  *Id.* at 16.   And the letters of support provided make clear that Badalian has continued to whisper in the ears of anyone who would listen about his self-proclaimed heroism on January 6.  *See* ECF No. 214-1 ("He assures us that he was protecting The Capitol and that was the only reason he was there at that day."); ECF No 214-2 ("Your honor, give Edward a chance to continue his education.   Maybe by government funding since during rally in D.C. he risked his life to protect government's most important building The Capitol from violent invaders who were breaking Capitols windows."); ECF No. 214-3 ("Edward says he was trying to defend the capitol.").[7]

Just two weeks ago, Badalian took to Twitter, not to express remorse, but to continue to cast himself in the role of January 6 hero.   On September 1, 2023, he directed a message at Georgia Governor Brian Kemp's official Twitter account:



edwardbadalian
@edwardbadalien                                                       ...

@BrianKempGA Person running this account, tell your boss that J6er Edward Badalian who disarmed windowbreakers thinks he is a fucking pathetic coward for not fighting back. They'll do it to him again and again and he will just take it. DISGUSTING. Stand up and fight back Brian.

3:07 PM · Sep 1, 2023 · **46** Views

---

[7] Badalian also claims to have "communicated to the Government, his desire to plead guilty to one felony count before trial."   ECF No. 214 at 10.   While the United States and defense counsel did, as is common practice, negotiate over possible dispositions, the defendant did not take the plea he was offered.   Regardless, the Court need not rely on counsel's representations about Badalian's willingness to enter a plea that was never offered.   Badalian went to trial, he chose to testify, and he lied.   He has not accepted responsibility at trial or since.   The Court can assess whether Badalian has ever shown sufficient reflection or candor such that he could have even gotten through a plea hearing.

Exhibit 1405.

To this day, Badalian has never walked away from what the Court rightly called his "manifesto," Verdict at 13: "We need to violently remove traitors and if they are in key positions rapidly replace them with able bodied Patriots."   Exhibit 904.03.   His continued adherence to the violent and revolutionary ideology that brought him to the District on January 6 is alarming, and undermines any last-minute claims of remorse he may offer.   *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol.   It didn't come when he went home.   It came when he realized he was in trouble.   It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day.   It came when he realized that he could go to jail for what he did.   And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan).   The certification of the Electoral College vote takes place every four years.   Nothing in the defendant's conduct or statements to date suggest he will not come back for the next certification he disagrees with to engage in the same dangerous and obstructive conduct.   He must be deterred.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency,

complying with congressional instructions, and the like.'"   *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to

impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.   18 U.S.C. § 3553(a).   After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge."   *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012).   The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender."   *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008).   "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant."   *Id*. at 1095.   "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances."   *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[8]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly."   *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id*. ("A

---

[8] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24–25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[9]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

As a leader of a conspiracy to obstruct the certification of the Electoral College vote, Badalian has few peers.   The most comparable case for consideration is that of Badalian's codefendant and coconspirator: Daniel Rodriguez.   *United States v. Daniel Rodriguez*, 21-cr-246-1 (ABJ).   Daniel Rodriguez pleaded guilty to four counts: 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding); 1512(c)(1) (Tampering with Documents or Proceedings); and 18 U.S.C. § 111(a)(1), (b) (Inflicting Bodily Injury on Certain Officers).   The Court calculated the Guidelines range at 97 to 121 months' imprisonment, and sentenced Rodriguez to 60 months on § 371 (the maximum penalty), 121 months on § 1512(c)(2), 24 months on § 1512(c)(1), and 151 months on § 111(a)(1), (b), all to be served concurrently. ECF No. 202.

What materially distinguishes Rodriguez's conduct from that of Badalian are his convictions for assault and his destruction of property inside the U.S. Capitol.   As an initial matter,

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES."   The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

these actions by Rodriguez were foreseeable and in furtherance of his scheme with Badalian.   *See* Verdict at 18 ("The government properly identifies the defendant Rodriguez's participation in the tunnel battle as an overt act in furtherance of the conspiracy, but that's only one of many."). Rodriguez's actions are attributable to Badalian not just as a legal matter, but as a practical and moral matter.   Without Badalian's planning and encouragement, Rodriguez may not even have been present in the District of Columbia on January 6.   "We know that the defendant egged Rodriguez on, stoked Rodriguez up, trained him for combat in advance and made sure he had a way to get to Washington."   Verdict at 17; *see also* Verdict at 23 ( "Chris Almonte said the defendant was there that evening when DJ was excited about what he'd stolen and what he'd done. Was the defendant concerned, was he disgusted with this violence?   Was he eager to be sure that all wrongdoers were prosecuted?   Was he ready, willing, and able to be a witness, as he claimed? No.   He was sending around a meme, proud of the day, made out of LEGOs.   He's pleased, too.").

Beyond Rodriguez, the only other defendants who have proceeded to trial on a § 371 or § 1512(k) charge, been found guilty, and been sentenced are from the Oath Keepers, 1:22-cr-15 (APM), and Proud Boys, 1:21-cr-175 (TJK), conspiracy cases, both of which included 18 U.S.C. § 2384 (Seditious Conspiracy) charges.   These cases have resulted in the following sentences to date[10]:

---

[10]  In addition to these cases, Dominic Pezzola, 1:21-cr-175 (TJK), a defendant in the Proud Boys conspiracy case, was sentenced to 180 months' incarceration for his conviction for 18 U.S.C. §§ 1512(c)(2) and 2.   Pezzola had been charged with § 1512(k) and § 2384, but was convicted of neither.   Kenneth Harrelson, 1:22-cr-15 (APM), an Oath Keeper conspiracy defendant, was found not guilty on the § 2384 and § 1512(k) charges and sentenced to 48 months on a § 1512(c)(2) count.

- Elmer Stewart Rhodes, 1:22-cr-15 (APM), who was also convicted of 18 U.S.C. § 2384, was sentenced to 216 months' incarceration.

- Kelly Meggs, 1:22-cr-15 (APM), who was also convicted of 18 U.S.C. § 2384, was sentenced to 144 months' incarceration.

- Jessica Watkins, 1:22-cr-15 (APM), was sentenced to 102 months' incarceration. Watkins was found not guilty of the § 2384 charge.

- Robert Minuta, 1:22-cr-15 (APM), who was also convicted of 18 U.S.C. § 2384, was sentenced to 54 months' incarceration.

- Joseph Hackett, 1:22-cr-15 (APM), who was also convicted of 18 U.S.C. § 2384, was sentenced to 36 months' incarceration.

- David Moerschel, 1:22-cr-15 (APM), who was also convicted of 18 U.S.C. § 2384, was sentenced to 36 months' incarceration.

- Edward Vallejo, 1:22-cr-15 (APM), who was also convicted of 18 U.S.C. § 2384, was sentenced to 36 months' incarceration.

- Ethan Nordean, 1:21-cr-175 (TJK), who was also convicted of 18 U.S.C. § 2384, was sentenced to 216 months' incarceration.

- Joseph Biggs, 1:21-cr-175 (TJK), who was also convicted of 18 U.S.C. § 2384, was sentenced to 204 months' incarceration.

- Zachary Rehl, 1:21-cr-175 (TJK), who was also convicted of 18 U.S.C. § 2384, was sentenced to 180 months' incarceration.

- Enrique Tarrio, 1:21-cr-175 (TJK), who was also convicted of 18 U.S.C. § 2384,

was sentenced to 240 months' incarceration.

The United States submits that Rodriguez's case is the most closely applicable to Badalian's, which is why the United States has recommended the same sentence for the conspiracy to obstruct for Badalian as Rodriguez received.   However, in light of the leadership, planning, training, and efforts to organize for violence, these defendants are the most closely analogous after Rodriguez. Notably, for each of the sentences noted above, the sentencing court imposed the same sentence for the § 1512(k) conviction as it did for the § 2384 conviction, rather than making a distinction between the two counts.   Further making these cases analogous to Badalian's, it is notable that among these defendants, only one—Dominic Pezzola—received a conviction for assaultive conduct.[11]

With respect to the conspiracy and obstruction offenses, Badalian and Rodriguez worked together and were equally culpable.   In fact, Badalian's complete lack of remorse and acceptance of responsibility are aggravating factors that were not present—at least not to the same degree— in the case of Rodriguez, who pleaded guilty.   Accordingly, the same sentence imposed on Rodriguez should be imposed on Badalian: 60 months for Count One and 121 months for Count Two.

## VI.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case.   Because a federal court possesses no "inherent authority to

---

[11]  Pezzola's sentence for 18 U.S.C. §§ 1512(c)(2) and 2 was 180 months, higher than the 96-month sentence he received for his 18 U.S.C. § 111(a)(1) conviction.

order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C.   § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property . . . including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii).   *See Fair*, 699 F.3d at 512 (citation omitted).   Because Badalian was convicted of a violation of an offense under Title 18, the VWPA applies.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664.   *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as a person directly and proximately harmed as a result of the offense of conviction.   *See Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).   Both statutes identify similar

covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[12]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for [his] individual contribution to the victims' total losses.   *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"); *see also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though

---

[12] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process.   *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Badalian to pay $2,000 in restitution for his convictions on Counts One, Two, and Ten.  This amount fairly reflects Badalian's role in the offense and the damages resulting from his conduct.   Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property.   Accordingly, such a restitution order avoids sentencing disparity.

## VII.   CONCLUSION

For the reasons set forth above, the United States recommends that the Court impose a
sentence of 121 months' incarceration, 36 months supervised release, and $2,000 restitution.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:   */s/ Anthony W. Mariano*
ANTHONY W. MARIANO, MA Bar No. 688559
Trial Attorney, Detailee
KIMBERLY L. PASCHALL, D.C. Bar No. 1015665
Assistant United States Attorney
Capitol Siege Section
United States Attorney's Office
for the District of Columbia
601 D Street N.W.
Washington, DC 20530
(202) 476-0319
Anthony.Mariano2@usdoj.gov
(202) 252-2650
Kimberly.Paschall@usdoj.gov

48